POMPEY *v.* GENERAL MOTORS CORPORATION

OPINION OF THE COURT

1. JUDGMENT — ACCELERATED JUDGMENT — PLEADING — LABOR RELATIONS — MICHIGAN STATE FAIR EMPLOYMENT PRACTICES ACT.

Allegations in a complaint, which are accepted as true for purposes of defendant-employer's motion for accelerated judgment, constitute a *prima facie* violation of the Michigan State Fair Employment Practices Act, where plaintiff, a Negro, alleged that he was unjustly and prejudicially suspended from his employment and demoted to a lesser paying classification after he accidentally dropped a die while employed as a crane operator (MCLA § 423.301 *et seq.*).

2. LIMITATION OF ACTIONS—STATUTES—LABOR RELATIONS—MICHIGAN STATE FAIR EMPLOYMENT PRACTICES ACT.

As a general rule, one who sues to enforce a statutory right is restricted by the statutory limitation of time within which suit must be brought; thus, plaintiff's statutory remedy under the Michigan State Fair Employment Practices Act is barred

REFERENCES FOR POINTS IN HEADNOTES

[1]  15 Am Jur 2d, Civil Rights §§ 58, 63.
[2]  51 Am Jur 2d, Limitation of Actions §§ 61, 80, 82.
[3]  15 Am Jur 2d, Civil Rights §§ 58, 59, 63.
[4]  15 Am Jur 2d, Civil Rights § 59.
    Fair employment statutes designed to eliminate racial, religious, or national origin discrimination in private employment.  44 ALR2d 1138.
[5]  1 Am Jur 2d, Actions §§ 73–79; 50 Am Jur, Statutes §§ 392–394, 405, 406.
[6]  15 Am Jur 2d, Civil Rights § 63.
[7, 8]  15 Am Jur 2d, Civil Rights §§ 1, 4, 58, 59, 63.
[9]  48 Am Jur 2d, Labor and Labor Relations §§ 1296, 1317.
[10]  48 Am Jur 2d, Labor and Labor Relations § 1304 *et seq.*
[11]  41 Am Jur, Pleading §§ 335–339.
[12]  48 Am Jur 2d, Labor and Labor Relations § 1314.
[13]  41 Am Jur, Pleading §§ 340–343.
[14]  41 Am Jur, Pleading §§ 335–339.
[15]  41 Am Jur, Pleading §§ 335–339.
    15 Am Jur 2d, Civil Rights §§ 62, 63.

where the applicable 90-day limitational period has run (MCLA § 423.307[b]).

3. CIVIL RIGHTS—CIVIL RIGHTS COMMISSION—JURISDICTION—DAM-
AGES—DISCRIMINATION.
Plaintiff may avail himself of a cumulative judicial remedy to recover compensation for damage suffered by reason of discrimination in private employment; the Civil Rights Commission's jurisdiction in this area is not exclusive.

4. CIVIL RIGHTS—MICHIGAN STATE FAIR EMPLOYMENT PRACTICES ACT.
The Michigan State Fair Employment Practices Act created a civil right in the opportunity to obtain employment without discrimination because of race, color, religion, national origin or ancestry (MCLA § 423.301 *et seq.*).

5. STATUTES — STATUTORY RIGHT — STATUTORY DUTY — STATUTORY
REMEDY — COMMON-LAW RIGHT.
The general rule is that where a new right is created or a new duty is imposed by statute, the remedy provided for enforcement of that right by statute for its violation and nonperformance is exclusive; correlatively, a statutory remedy for enforcement of a common-law right is deemed only cumulative but, in the absence of a pre-existent common-law remedy, the statutory remedy is not deemed exclusive if such remedy is plainly inadequate or unless a contrary intent clearly appears.

6. CIVIL RIGHTS — ILLEGAL DISCRIMINATION — STATUTORY DUTY —
CRIMINAL LAW — ACTION — DAMAGES — STATUTES.
An aggrieved person has clearly a civil right of action for damages where there has been illegal discrimination although the provisions for the enforcement of a civil rights statute under which the plaintiff claims redress provides for a criminal prosecution only; as this right accrues by virtue of the general rule that where a statute imposes upon any person a specific duty for the protection or benefit of others, neglect or refusal to perform the duty creates a liability for any injury or detriment caused by such neglect or refusal, if the injury or hurt is of the kind which the statute was intended to prevent.

7. CIVIL RIGHTS—CIVIL RIGHTS COMMISSION—JURISDICTION—CONSTI-
TUTIONAL LAW—STATUTES.
Michigan constitutional provision creating a Civil Rights Commission and the statute defining what constitutes an unfair employment practice and the procedures available to a person

claiming to be aggrieved by such practice did not grant exclusive jurisdiction to that Commission to secure the equal protection of civil rights without discrimination as that section of the constitution stated that "nothing contained in this section shall be construed to diminish the right of any party to direct and immediate legal or equitable remedies in courts of this state" (Const 1963, art 5, § 29; MCLA § 37.1 *et seq.*).

8. CIVIL RIGHTS — DAMAGES — STATUTES — DISCRIMINATION — PRIVATE EMPLOYMENT — LABOR RELATIONS.

   A plaintiff can maintain a civil damage action for redress of his statutorily created right to be free from discrimination in private employment, and this remedy may be pursued in addition to the remedial machinery provided by the Michigan State Fair Employment Practices Act (MCLA § 423.301 *et seq.*).

9. LABOR RELATIONS—COLLECTIVE BARGAINING AGREEMENT—COURTS—JURISDICTION.

   State courts have jurisdiction over a suit by an employee against his employer for breach of a collective bargaining agreement but Federal law must be applied.

10. LABOR RELATIONS—COLLECTIVE BARGAINING AGREEMENT—GRIEVANCE AND ARBITRATION PROCEDURES.

    Exceptions have been engrafted onto the Federal labor rule, that an employee may not maintain an action against his employer for an alleged breach of a collective bargaining agreement where the employee has not first exhausted the grievance and arbitration procedures as established under the collective bargaining agreement upon which he bases his suit, and the theory that since "these contractual remedies have been revised and often controlled by the union and the employer, they may well prove unsatisfactory or unworkable to the individual grievant."

11. JUDGMENT—ACCELERATED JUDGMENT—PLEADING—AFFIDAVITS.

    Upon determination of a motion for accelerated judgment, well-pleaded facts are accepted as true and contents of affidavits may also be considered (GCR 1963, 116.3).

12. PLEADING—LABOR RELATIONS—AFFIDAVIT—GRIEVANCE FORM.

    Plaintiff sufficiently alleged that his union arbitrarily and with bad faith thwarted his efforts to redress his grievance where his affidavit, filed in opposition to motions for accelerated judgment, if accepted, avers sincere attempts to remedy this

grievance by prompt filing of the proper form, but alleges a lack of response or interest by the shop committeeman, the local president, the regional representative of the union, and the international union itself as an over-technical scrutinization of an employee grievance form should not substitute for well-pleaded allegations contained in the complaint and affidavit.

13. JUDGMENT — SUMMARY JUDGMENT — ACCELERATED JUDGMENT — FAILURE TO STATE A CLAIM — COURT RULES.

A defense for failure to state a claim must be asserted by motion for summary judgment and may not be made by motion for accelerated judgment (GCR 1963, 116, 117).

14. APPEAL AND ERROR—ACCELERATED JUDGMENT—PLEADING—LABOR RELATIONS—EXHAUSTION OF REMEDIES.

Plaintiff sufficiently alleged that his union acted arbitrarily in withdrawing his grievance from the contractual grievance machinery; therefore, it was error for the trial judge to grant the defendant-employer's motion for accelerated judgment, since that motion solely tested the sufficiency of plaintiff's pleadings in terms of a defense of exhaustion of contractual remedies (GCR 1963, 116).

CONCURRING OPINION

BLACK, J.

15. JUDGMENT—ACCELERATED JUDGMENT—PLEADING—LABOR RELATIONS—DISCRIMINATION—UNIONS.

*Motion by defendant for accelerated judgment should have been denied where plaintiff, in an action against his employer for racial discrimination in a job transfer and for breach of contract, sufficiently alleged that his union arbitrarily and with bad faith thwarted his efforts to redress his grievance.*

Appeal from Court of Appeals, Division 2, T. M. Burns, P. J., and Quinn and Roberts, JJ., affirming Genesee, Anthony J. Mansour, J. Submitted May 5, 1971. (No. 21 April Term 1971, Docket No. 52,955.) Decided August 27, 1971. Rehearing denied September 28, 1971.

24 Mich App 60 reversed.

Complaint by Jesse James Pompey against General Motors Corporation and UAW Local 1292 for

damages for racial discrimination in a job transfer
and for breach of contract. UAW International Un-
ion intervened as a party defendant. Action against
the Local and International Unions dismissed by
stipulation. Accelerated judgment for General
Motors Corporation. Plaintiff appealed to the Court
of Appeals. Affirmed. Plaintiff appeals. Reversed.

*C. Robert Beltz,* for plaintiff.

*Ross L. Malone,* General Counsel, *Harry S. Ben-
jamin, Jr., Edmond J. Dilworth, Jr.,* and *Eugene L.
Hartwig,* for General Motors Corporation.

T. E. BRENNAN, J.

## THE CASE

Plaintiff commenced this action on November 17,
1965, against General Motors Corporation and
UAW-CIO, Local 1292. The complaint alleged four
separate causes of action in four counts. Counts I
and III were directed against General Motors and
sought $20,000 in damages from defendant corpora-
tion on each count; Counts II and IV were directed
against UAW-CIO, and sought $20,000 in damages
from defendant labor union on each count. Counts
II and IV were disposed of by the circuit court's or-
der of December 21, 1967, dismissing plaintiff's suit
as to defendant UAW-CIO, Local 1292, and the in-
tervenor-defendant, International Union, UAW.[1]

In Count I of the complaint, plaintiff alleges that
on or about May 27, 1964, when he was employed as
a crane operator at a General Motors plant, he ac-
cidentally dropped a die and thereafter General
Motors "unjustly and prejudicially suspended the

---

[1] The order of dismissal was based upon a stipulation for a vol-
untary dismissal entered into between counsel for the plaintiff and
the two union defendants.

Plaintiff from his employment and demoted him to the lesser paying classification of crane hooker in which capacity he is currently employed." Count I further alleges that,

"6. The Plaintiff is a member of the Negro race.

"7. That just prior to and shortly after the above described suspension and demotion, a number of employees of the Defendant corporation employed at the same plant and in the same capacity as crane operators were disciplined and suspended because of the severe infractions of company rules and unsafe work habits. Several had been charged with unsafe work habits before and at least one was charged with operating a crane while under the influence of intoxicating liquor. None of these individuals, all members of the Caucasian race, were demoted because of the infractions.

"8. The Plaintiff herein had received no previous reprimands or discipline while working as a crane operator.

"9. The Defendant herein, General Motors Corporation owed a duty to the Plaintiff to refrain from, because of race, discriminating against him with respect to tenure, terms, conditions or privileges of employment, pursuant to M.S.A. 17.458 (3)(a).

"10. That the Michigan Constitution Article I, Section 2, prohibits the denial to any person of the enjoyment of his civil rights because of race. The Defendant, General Motors Corporation, was under a duty to refrain from denying the civil rights of the plaintiff herein, which includes equal opportunity and treatment in the field of employment.

"11. But the Defendant, General Motors Corporation, did breach the duties owed the Plaintiff under Michigan Fair Employment Practices Act and the Michigan Constitution by discriminating against him in the exercise of his civil rights to equal employment and for discriminating against him because of his race, color, national origin or ancestry by failing to

accord him the same rights and privileges as an employee of the Caucasian race."

In Count III, plaintiff re-alleges the factual allegations set forth in Count I, and further asserts that his alleged demotion from the crane operator classification constituted a violation of "an employment contract [which] existed between Plaintiff and Defendant General Motors Corporation, which was negotiated on his behalf by his union, bearing the date of September 20, 1961, which provided it to be 'applied to all employees without regard to race, color, creed or national origin.'" He also alleged violation of a letter dated September 18, 1961, signed by a vice-president of General Motors which provides in pertinent part that General Motors extends equal employment opportunities to all employees on a nondiscriminatory basis.

On December 8, 1965, General Motors filed a motion for accelerated judgment of dismissal in the circuit court pursuant to Rule 116 of the Michigan General Court Rules. The motion asserted that the court lacked jurisdiction over the subject matter of Counts I and III of the suit; that Count I was barred by the statute of limitations set forth in the Michigan State Fair Employment Practices Act, and was within the exclusive jurisdiction of the Michigan Civil Rights Commission; that Count III was barred by reason of the disposition made by plaintiff's exclusive bargaining representative prior to commencement of the action in withdrawing plaintiff's grievance from the contractual grievance procedure.

Attached to the motion were two affidavits. One of them, by the plant director of industrial relations, Ray Finley, set forth that on May 27, 1964, plaintiff filed a grievance through his bargaining representative which stated:

" 'Protest management removing me from the crane operator group. Demand that I be returned to the crane operator group at once.' "

The Finley affidavit further stated that the grievance which plaintiff did file was withdrawn from the grievance procedure by his collective bargaining representative on September 3, 1964. A second affidavit, by Eugene Hartwig, counsel for General Motors, said:

"On January 15, 1965, plaintiff filed an application for the issuance of a complaint against defendant Corporation   *   *   *   with the Michigan Civil Rights Commission alleging in substance that his removal by defendant Corporation from the 'crane operator' classification   *   *   *   constituted discrimination against him because of his race in violation of the Constitution of the State of Michigan.

"On April 27, 1965, the Civil Rights Commission entered its order dismissing plaintiff's claim.   *   *   *

"   *   *   *   that plaintiff did not within fifteen (15) days from the date of mailing of said order on April 28, 1965, request in writing of the commission a reconsideration of its refusal to issue a complaint.

"   *   *   *   that plaintiff has not brought any action or proceeding against the Commission in any circuit court in the State of Michigan wherein he claims to be aggrieved by the order of said Commission entered on April 27, 1965."

Plaintiff filed two affidavits in opposition to the defendant corporation's and defendant local union's simultaneously filed motions for accelerated judgment. The first affidavit stated, in pertinent part:

"7. On numerous occasions, I attempted to get UAW-CIO, Local No. 1292 to process my grievance against the corporation and exhaust all of the avenues open to have me return to the classification of crane operator. The union refused to do this,

and on their own, dismissed my grievance for the reasons set out in my Complaint filed in this cause.

"8. As soon as it became clear that my union was not going to back me up in this matter and that the General Motors Corporation would not reinstate me in my proper classification, I notified the Michigan Civil Rights Commission, but was informed that the jurisdictional period of 180 days from the date of the offense had elapsed and, therefore, the commission was without jurisdiction to proceed with the matter.

"9. My failure to timely file a claim with the Michigan Civil Rights Commission was due to the fact that the union representatives indicated that they would take care of this matter for me in a fair fashion. I was advised and had every reason to believe that my grievance would be processed and that I would be returned to my classification of crane operator, from which I was wrongfully demoted, without further affirmative action on my part.

"10. That many white men and employees of the defendant corporation with much worse work records than mine are now employed by the Defendant corporation as crane operators. Many of these men have been suspended for [*sic*] times, but none have been demoted, and in every instance where the union has stepped in and filed a grievance, the man has been reinstated."

The second affidavit filed by plaintiff, in response to the international union's motion for accelerated judgment, specially dealt with the steps plaintiff went through in an attempt to appeal the union's allegedly wrongful dismissal of his grievance and the reasons for not pursuing those steps expeditiously.[2]

---

[2] "1. After August 31, 1964, I continued contacting my shop committeeman, Bill Love, concerning my reinstatement as a crane operator and the handling of my grievance which the union was handling

with the management. Before the strike, Love told me that he would guarantee me that after the strike I would be reinstated as a crane operator. When I returned to work following the strike my classification was still crane hooker and I went to Mr. Love and asked him if my grievance had been settled. · He told me that that very day they were having a meeting with management and that my grievance would be discussed. Approximately a week went by and I didn't hear from Mr. Love so I contacted him again and he told me that he and one of the other committee men, whose name I don't recall, had withdrawn the grievance. He further told me that if I asked him about getting back on the job as a crane operator again, I would never get back on a crane and he would personally see to that. I believe that this conversation occurred on a Wednesday or Thursday.

"2. On the following Monday I went to Local No 1292's union hall and talked with an individual who I was told was the president of the union. When I went in I asked to talk with the president and was referred to this individual. I told him what happened and advised him that I wanted to appeal what the grievance committee had done. He checked my file and said that my grievance had been withdrawn and there was nothing that could be done about it. He told me that the grievance had been carried through every step it could have been and that the International Union had withdrawn it in the third step.

"I again told him that I wanted to appeal and he told me that an appeal was not possible and that there was nothing that the local union could do to help me. I was told that the decision could not be appealed.

"3. I next wrote the International Union relating the facts as to what occurred and asked them why my grievance had been withdrawn and if it had actually gotten to the third step. This letter was directed to Solidarity House and I never received a response.

"4. The week after I had met with the president of the local union, I went to the regional office of the union 1111 Downey Street in Flint and talked with an individual who I believe was named Larry Hubert who advised me he was a regional representative. He asked me what had occurred and I again explained everything that had happened. He called the local union hall and talked with them on the phone for some time and then advised me that there wasn't anything he could do for me. I told him that I wanted to appeal what had happened and he told me that if the local union would not permit an appeal, there was nothing he could do. He said that if the local union had withdrawn my grievance, there was nothing that I could do.

"5. After my conversation with him I went back to the local union on the same day and talked again with the president. He said again that I could not appeal but that he would talk with management and see what could be done. I waited a week, the meeting with management usually occurs on Thursday, and went back to the union hall where the president told me that management would not permit me to be reinstated and there was nothing the union could do for me.

"6. I felt there was nothing more that I could do and so I then went to the Michigan Civil Rights Commission and eventually to private legal counsel for aid.

On May 3, 1967, the court entered its order denying General Motors' motion, but at the same time "FURTHER ORDERED that the questions raised and issues posed in said motion may again be raised at the conclusion of the Plaintiff's proofs upon trial".

On December 10, 1968, the case came on for trial with General Motors as the sole defendant. The factual and legal issues had been limited to those set forth in Counts I and III of plaintiff's complaint as a result of the December 21, 1967, order dismissing Counts II and IV, and by the circuit court's final pre-trial conference order of April 1, 1968. At the conclusion of the plaintiff's case on December 12, 1968, General Motors renewed its motion for accelerated judgment of dismissal in accordance with the right reserved to it by the circuit court's order of May 3, 1967.

The trial judge based his ruling in part on § 13 of Article 32 of the International Union Constitution, which provides as follows:

"It shall be the duty of any member or subordinate body who feels aggrieved by any action, decision or penalty imposed upon him or it to exhaust his or its remedies and all appeals therefrom under the laws of this International Union prior to appealing to a civil court or governmental agency for redress,"

and also on § 16 of Article 6, which provides that:

"The International Union and the local union to which the member belongs and each of them are by this irrevocably designated, authorized and em-

---

"7. I was never given a copy of nor provided with the International Union's Constitution nor the Constitution and By-laws of the local union. I first saw these documents when they were shown to me by my attorney.

"8. I followed all of the procedures which I thought were available and open to me, speaking with representatives at the local, regional and writing the International level."

powered exclusively to appear and act for him and in his behalf before any board, court, committee or other tribunal in any matter affecting his status as an employee."

The trial judge reasoned that those provisions required exhaustion of the administrative remedies within the structure of the collective bargaining agreement before a civil action could be brought.

He further reasoned that the complaint which plaintiff had in this action was embodied in § 6a of the International contract which provides as follows:

"It is the policy of General Motors and the UAW-AFL-CIO that the provisions of this agreement be applied to all employees covered by this agreement without regard to race, color, creed or national origin. Any claims of violation of this policy may be taken up as a grievance, provided that any such claim must be supported by written evidence by the time it is presented by the Shop Committee at a meeting with Management."

The trial court then concluded that the grievance filed by plaintiff on May 27, 1964, contained no allegations of a 6a violation,[3] and that even if there had been a reference to a 6a violation, plaintiff had failed to exhaust his intra-union remedies. Defendant's motion for accelerated judgment of dismissal was then granted as to both counts.[4]

---

[3] As appears from the circuit court's opinion granting defendant's motion for dismissal, on May 23, 1963, a year prior to the removal of plaintiff from the crane operator position which is the subject of this lawsuit, plaintiff filed a grievance specifically charging racial discrimination in violation of paragraph (6a) of the National Agreement in connection with his removal from the crane in May of 1963. At the same time plaintiff filed a separate grievance charging an unjust demotional transfer. Both of these grievances were resolved by plaintiff's union through the contractual grievance procedure by the restoration of plaintiff to the crane operator classification on June 11, 1963.

[4] The learned trial judge's reasons for granting the motion for accelerated judgment as to Count I are less than clear. The only

The Court of Appeals affirmed, 24 Mich App 60, concluding that plaintiff had failed to exhaust his remedies under the collective bargaining agreement, and there was nothing in the record even to support an inference that the employer repudiated the contractual procedures or that the union refused, wrongfully or otherwise, to process plaintiff's grievance based on alleged discrimination, since no 6a violation had ever been charged.[5]

## DISCUSSION

### I

The allegations in Count I of plaintiff's complaint,[6] which we accept as true for purposes of this motion for accelerated judgment,[7] constitute a *prima facie* violation of the Michigan State Fair Employment Practices[8] Act. That act provides in § 7(b):

---

mention of Count I in the transcript of the opinion of the trial court on the motion is as follows:

"It is this Court's opinion that there is no need to decide the question of preemption of the field by the civil rights legislation, the constitutional provision or the fair employment practices act, which is in force through the Michigan Civil Rights Commission by virtue of the amendment. The same reasoning as was used in *Vaca* to determine that even if the National Labor Relations Act preempted the field in employee-employer relationships, that the Plaintiff was still under an obligation to exhaust his contractual remedies through the International contract and through the constitution of the union."

*Vaca* v. *Sipes* (1967), 386 US 171 (87 S Ct 903, 17 L Ed 2d 842), decided on this point only that the NLRB did not have exclusive jurisdiction over cases involving an alleged breach of the duty of fair representation, and thus that the Board did not preempt judicial cognizance over such suits. But the issue as procedurally framed by defendant's motion under GCR 1963, 116 as to Count I is wholly different: the availability of a civil damage action as a remedy cumulative to that specified in a state civil rights statute.

[5] The Court of Appeals thus affirmed the lower court's action as to both counts, but did not discuss its reasons for affirming as to Count I.

[6] Detailed *ante* at pp 541-543.

[7] *Cortez* v. *Ford Motor Company* (1957), 349 Mich 108.

[8] MCLA § 423.301 *et seq.* (Stat Ann 1968 Rev § 17.458[1] *et seq.*).

"Any individual claiming to be aggrieved by an alleged unlawful employment practice may, by himself or his agent, make, sign and file with the board, within 90 days, after the alleged act of discrimination, a verified complaint in writing * * * ." MCLA § 423.307(b) (Stat Ann 1968 Rev § 17.458 [7][b]).

From Exhibit 1 attached to the Finley affidavit,[9] it is clear that the incident concerning which plaintiff complains in this case occurred on May 28, 1964, when he was transferred from the crane operator classification to the press operator classification. This suit was filed on November 17, 1965, some 17-1/2 months after his grievance was withdrawn.

Defendant contends that since Count I of plaintiff's complaint alleges that the action which the employer took on May 28, 1964, constitutes a violation of the Michigan State Fair Employment Practices Act, plaintiff is bound by the statute of limitations embodied in that act which expressly provides that complaints of violations of the act must be filed within 90 days after the alleged act of discrimination. In support of that contention, defendant notes the general rule of law that one who sues to enforce a statutory right is restricted by the statutory limitation of time within which suit must be brought.[10] We re-affirm our adherence to this rule and are therefore constrained to agree with defendant that plaintiff's *statutory* remedy is barred since the applicable limitational period has run.[11]

---

9 See *ante* at pp 543, 544.

10 See, *e.g., Bay State Milling Co. for use and benefit of Hartford Accident & Indemnity Co.* v. *Izak* (1945), 310 Mich 601; *Metzen* v. *Department of Revenue* (1945), 310 Mich 622; *Finkelstein* v. *Department of Revenue* (1945), 312 Mich 186.

11 The 1963 Constitution elevated plaintiff's statutory right to the status of a constitutional right, but the limitational period remained intact. See MCLA § 423.307(b) (Stat Ann 1968 Rev § 17.458 [7][b]). We discuss defendant's arguments relative to the "exclusive" jurisdiction of the constitutional body of the Civil Rights Com-

But it is transparently clear that plaintiff in Count I is asserting a cumulative judicial remedy for redress of his civil right to freedom from discrimination in private employment, rather than any *statutory* remedy.

## ISSUE

Whether a civil action lies to recover compensation for damages suffered by reason of discrimination in private employment.

## DECISION

For reasons presently given, we reject defendant's arguments that the Civil Rights Commission's jurisdiction in this area is exclusive, and conclude that plaintiff may avail himself of a cumulative judicial remedy in vindication of this specific civil right.

Our reasons for so holding are immersed in the origins of plaintiff's asserted civil right. In 1955,

---

mission this page, but it should be noted in passing that no other constitutional provision—either state or Federal—relates to enforcement of our state constitutional right to freedom from discrimination in *private* employment. See fn 20, *infra*, for a discussion of whether Article 1, § 2 of the 1963 Constitution, the anti-discrimination declaration, is self-implementing in relation to acts of private discrimination.

Thus, acts of a private employer in preventing a person from working or discriminating against such persons on account of race do not violate the Federal constitution. Nor do they violate the Federal criminal statute proscribing conspiracies to deprive citizens of their rights. See 18 USC § 241 and *Hodges* v. *United States* (1905), 203 US 1 (27 S Ct 6, 51 L Ed 65).

(However, such private discrimination in employment may be actionable as an "unlawful employment practice" in an industry affecting commerce and meeting other statutory requirements under Title VII of the Civil Rights Act of 1964, see 42 USC § 2000[a] *et seq.*).

But the converse of this situation (*i.e.*, not a state statute *guaranteeing* the right, as here, but a statute or ordinance which on its face or as applied *denies* the right) is offensive to the equal protection and due process clauses of our Federal and State constitutions. For example, *Yick Wo* v. *Hopkins* (1886), 118 US 356 (6 S Ct 1064, 30 L Ed 220) (municipal ordinance aimed at preventing persons of certain race from carrying on a business invalid under Fourteenth Amendment).

the fair employment practices act created a civil right[12] in the opportunity to obtain employment without discrimination because of race, color, religion, national origin or ancestry. Defendant contends, and we agree, that prior to the passing of this important legislation in 1955, there was in Michigan no recognized legal remedy for acts of discrimination based on race in private employment.[13] While a right of action was recognized for racial discrimination in public accommodation (*Ferguson v. Gies* [1890], 82 Mich 358) and in the enjoyment of various other civil rights, the right to be free from discrimination on account of race in private employment was not regarded as a civil right entitled to protection of the law.

We recognize that the fact that there was no pre-existent common-law remedy for racial discrimination in private employment is generally highly significant in determining the exclusiveness of the statutory remedy. The general rule, in which Michigan is aligned with a strong majority of jurisdictions, is that where a new right is created or a new duty is imposed by statute, the remedy provided for enforcement of that right by the statute for its violation and nonperformance is exclusive. *Thurston v. Prentiss* (1849), 1 Mich 193; *In re Quinney's Estate* (1939), 287 Mich 329; *Lafayette Transfer & Storage Co. v. Michigan Public Utilities Commission* (1939), 287 Mich 488.[14] Correlatively, a statutory

---

[12] The fair employment practices act was prefaced with a preamble stating:

"The opportunity to obtain employment without discrimination because of race, color, religion, national origin or ancestry *is hereby recognized as and declared to be a civil right.*" MCLA § 423.301 (Stat Ann 1968 Rev § 17.458[1]). (Emphasis added.)

[13] See generally, Anno, *Fair employment statutes designed to eliminate racial, religious, or national origin discrimination in private employment,* 44 ALR2d 1138.

[14] See also *Board of Education of Erie County v. Helsby* (1970), 64 Misc 2d 473 (314 NYS2d 944); *Arterberry v. Texas Department*

remedy for enforcement of a common-law right is deemed only cumulative.[15]

But courts have forged exceptions to these general rules when the statutory rights infringed were civil rights. Although there is some authority to the contrary[16] most decisions have held that a person aggrieved by the violation of a civil rights statute is entitled to pursue a remedy which will effectively reimburse him for or relieve him from violation of the statute, notwithstanding the statute did not expressly give him such right or remedy. *McCabe* v. *Atchison, T. & S. F. R. Co.* (1914), 235 US 151 (35 S Ct 69, 59 L Ed 169); *People ex rel. Bibb* v. *Alton* (1904), 209 Ill 461 (70 NE 640); *Randall* v. *Cowlitz Amusements, Inc.* (1938), 194 Wash 82 (76 P2d 1017).

We turn to a discussion of prior decisions in Michigan relating to the issue of whether a person has a private remedy for violation of a civil rights statute in the absence of any pre-existent common-law remedy. *Ferguson* v. *Gies, supra,* involved an action under a civil rights statute[17] growing out of

_of Public Safety_ (Tex Civ App, 1970), 453 SW2d 212; _State ex rel. Conn_ v. _Board of Trustees of Wisconsin Retirement Fund_ (1969), 44 Wis 2d 479 (171 NW2d 418); _United States_ v. _Madison County Board of Education_ (CA5, 1964), 326 F2d 237. There are two important qualifications to this rule of statutory construction: In the absence of a pre-existent common-law remedy, the statutory remedy is not deemed exclusive if such remedy is plainly inadequate, _Tucker_ v. _Missoula Light & Railway Company_ (1926), 77 Mont 91 (250 P 11), or unless a contrary intent clearly appears, _Norton_ v. _Southern R. Co._ (1930), 138 Misc 784 (246 NYS 676).

[15] For example, _Flores_ v. _Los Angeles Turf Club Inc._ (1961), 55 Cal 2d 736 (361 P2d 921, 13 Cal Rptr 201); _People ex rel. Cantazaro_ v. _Centrone_ (1964), 48 Ill App 2d 484 (199 NE2d 226); _Drinkhouse_ v. _Parka Corporation_ (1957), 3 NY2d 82 (143 NE2d 767, 164 NYS 2d 1). But it has been held that a statute providing a remedy adapted to enforcement of a liability created thereby impliedly excludes less appropriate common-law remedies. _Shriver_ v. _Woodbine Savings Bank_ (1932), 285 US 467 (52 S Ct 430, 76 L Ed 884).

[16] See _e.g., Woolcott_ v. _Shubert_ (1915), 169 App Div 194, 154 NYS 643; _White_ v. _Pasfield_ (1918), 212 Ill App 73.

[17] PA 1885, No 130, which provided in pertinent part:

" 'Section 1. That all persons within the jurisdiction of this State

the refusal of a restaurant keeper to serve colored persons in a particular part of his restaurant although there were vacant tables at which he would have served white persons. The Court said:

"But it is claimed by the defendant's counsel that this statute gives no right of action for civil damages; that it is a penal statute; and that the right of the plaintiff under it is confined to a criminal prosecution. The general rule, however, is that where a statute imposes upon any person a specific duty for the protection or benefit of others, if he neglects or refuses to perform such duty, he is liable for any injury or detriment caused by such neglect or refusal, if such injury or hurt is of the kind which the statute was intended to prevent; nor is it necessary in such a case as this to declare upon or refer to the statute." P 365.

*Ferguson* would undoubtedly have settled the question in Michigan in favor of the right to maintain such private action, but the Court then added:

"The common law as it existed in this State before the passage of this statute, and before the colored man became a citizen under our Constitution and laws, gave to the white man a remedy against any unjust discrimination to the citizen in all public places. It must be considered that, when this suit was planted, the colored man, under the common law of this State, was entitled to the same rights and privileges in public places as the white man, and he must be treated the same there; and that his right of action for any injury arising from an unjust discrimination against him is just as perfect and sacred in the courts as that of any

---

shall be entitled to the full and equal accommodations, advantages, facilities, and privileges of inns, *restaurants*, eating-houses, barbershops, public conveyances on land and water, theaters, and all other places of public accommodation and amusement, subject only to the conditions and limitations established by law, and applicable alike to all citizens.' " P 364. (Emphasis in Ferguson case.)

other citizen. This statute is only declaratory of the common law, as I understand it now to exist in this State." P 365.

It was upon this language that defendant in *Bolden* v. *Grand Rapids Operating Corporation* (1927), 239 Mich 318, based his contention that the civil rights statute was immaterial to the earlier decision, and hence that *Ferguson* was not authority for the right to maintain a private action for exclusion from a place as to which the common law did not forbid discrimination, but our Court refused to adopt such a position. *Bolden* dealt with a Negro who had been refused a ticket permitting him to occupy a seat in defendant's theatre on account of his color. This Court unanimously upheld plaintiff's right to maintain a civil action for damages, despite the fact that the statute was criminal in form and provided imprisonment or fine or both for its violation. The argument advanced there as to the exclusiveness of the statutory remedy follows closely the reasoning of defendants here:

"2. The claim of defendant's counsel in regard to the right of action is thus stated:

" 'The civil rights act is a criminal statute only, and does not give rise to an action for damages for its violation.'

"Counsel urge that 'a theater is a private enterprise;' that 'in the absence of statute the proprietor of a theater may exclude therefrom any persons whomsoever;' that plaintiff's right of action must be based solely on the violation of the statute; that no such right existed at common law; that the statute does not in terms confer the right, and therefore the only liability of defendant for its violation is by criminal prosecution." P 325.

Our Court unqualifiedly rejected such an argument when dealing with civil rights statutes, con-

cluding that the aggrieved person may maintain an action for damages for injuries suffered by the violation of the civil rights statute despite the fact that the statute made no express provision for such recovery. We cited as the controlling principle:

" 'In cases. where there has been illegal discrimination the person aggrieved has clearly a civil right of action for damages, and this is true although the provision for the enforcement of a civil rights statute under which the complainant claims redress provides for a criminal prosecution only. This right accrues by virtue of the general rule that where a statute imposes upon any person a specific duty for the protection or benefit of others, neglect or refusal to perform the duty creates a liability for any injury or detriment caused by such neglect or refusal, if the injury or hurt is of the kind which the statute was intended to prevent.' " P 328.

The fact that in *Ferguson* there was a common-law remedy was expressly rejected as a basis for positing the private remedy. Thus *Bolden* clearly affirms that, despite the absence of any pre-existent common-law remedy, the fact that a civil rights statute does not specifically give the person aggrieved a right to damages for the injury suffered does not preclude maintenance of the civil damage action.

More recently, we reiterated this holding in *St. John* v. *General Motors Corp.* (1944), 308 Mich 333. There, a civil damage action was held maintainable for violation of a penal anti-discrimination statute.[18] Justice WIEST, writing for the Court, stated:

---

[18] Admittedly, both *Bolden* and *St. John* dealt with civil rights statutes which were strictly penal in form, and held that this did not prevent the person aggrieved from maintaining a civil damage action. But a strong majority of decisions have allowed the aggrieved person a cumulative civil damage action *regardless of the form which the civil rights statute has taken (i.e.,* whether it provides

"If plaintiff has suffered financial damage by reason of defendant's noncompliance with the mandatory provisions of the statute applicable to claimants' employment then civil action may be maintained. *Bolden* v. *Grand Rapids Operating Corp.* [1927], 239 Mich 318 (53 ALR 183). The statute establishes specified personal civil rights and if there has been discrimination between sexes in the instances at bar the remedy by action at law is available to claimants." P 336.

*Bolden* and *St. John* would seem wholly dispositive of the issue of maintenance of the Count I civil damage action, but defendant further contends that the action is not maintainable since the exclusive machinery for enforcement of the right is now vested in the Civil Rights Commission.

In 1964, with the promulgation of the new Michigan Constitution, the Fair Employment Practices Commission was abolished and was superseded by the constitutionally created Civil Rights Commission which, in Article 5, § 29, has the duty in a manner which may be prescribed by law to investigate alleged discrimination against any person because of religion, race, color or national origin in the enjoyment of the civil rights guaranteed by law and by this constitution, and to secure the equal protection of such civil rights without such discrimination.

Section 29 of Article 5 of the constitution goes on to provide:

"The commission shall have power, in accordance with the provisions of this constitution and of general laws governing administrative agencies, to

---

for no sanctions or remedies whatsoever; provides only for penal sanction; provides only for a penalty). See generally 15 Am Jur 2d, Civil Rights, § 63, dealing with the enforcement of civil rights under state law, for a citation of authorities which have held that the civil action may be maintained in addition to the express relief provided by statute.

promulgate rules and regulations for its own procedures, to hold hearings, administer oaths, through court authorization to require the attendance of witnesses and the submission of records, to take testimony, and to issue appropriate orders. The commission shall have other powers provided by law to carry out its purposes. *Nothing contained in this section shall be construed to diminish the right of any party to direct and immediate legal or equitable remedies in courts of this state."* (Emphasis added.)

In 1963, in anticipation of the establishment of the Civil Rights Commission under the 1963 Constitution, the Legislature amended the 1955 law, substituting all references to the former Fair Employment Practices Commission with appropriate references to the new Civil Rights Commission, but leaving intact those sections of the 1955 law defining what constitutes an unfair employment practice and the procedures available to a person claiming to be aggrieved by such practice. PA 1963 (Ex Sess), No 45.

Based on this historical framework, defendant contends that the right to be free from acts of racial discrimination in private employment is a right created by legislative enactment for which a specific statutory remedy has been established with exclusive jurisdiction to grant that remedy vested in a constitutionally created administrative body whose final orders only are subject to judicial review.

The third sentence of the second paragraph of Article 5, § 29 (italicized above) answers that argument. That sentence of the 1963 Constitution is referred to as the "judicial remedies provision"; the debate in the constitutional convention made its purport clear:

"The convention did not intend to confer exclusive jurisdiction in the civil rights field on the Commission. *Remedies in the courts, including both those existing at the time and those subsequently created by legislative enactment or judicial decision, are not affected by the civil rights commission provision.* Thus, an individual who has been subjected to illegal discriminatory treatment in a place of public accommodation may bring a damage action in the circuit court against the business engaged in such discrimination; and the legislature may create new civil and criminal remedies for acts of private discrimination and may vest jurisdiction in the courts."[19]   (Emphasis added.)

Since *Bolden* and *St. John* clearly affirm the existence of a cause of action for damages under a civil rights statute, and since the judicial remedies provision in § 29 of Article 5 clearly intended no *displacement* of judicial remedies, defendant's argument as to the "exclusive" jurisdiction of the Civil Rights Commission is without merit.[20]

---

[19] Cramton, *The Powers of the Michigan Civil Rights Commission,* 63 Mich L Rev 5, 23 (1964). Professor Cramton concludes: "In short, the Commission does not have exclusive jurisdiction within its sphere of competence. *Existing and future judicial remedies are clearly preserved." Id.* See, also, *id.* fn 76 " * * * The discussion of the 'judicial remedies' provision may be found in 2 RECORD [Official Record of the 1961 Michigan Constitutional Convention] 1999–2001, 2192–96, 2756–62. The debate clearly indicates that the primary intent was to preserve judicial jurisdiction in the civil rights field." (Emphasis added.)

[20] We note parenthetically that the anti-discrimination provision in Article 1, § 2 of the 1963 Constitution was not intended to create new civil rights. That provisions states:

"No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation."

See Cramton, *supra,* at 13: "The anti-discrimination provision adopts and builds upon existing law; it does not purport to create or define new civil rights in areas of private discrimination."

In the absence of legislative implementation, the provision does not apply to private discrimination. Cramton, *supra,* at 30: "Again and again it was stated that the majority proposal [the eventual

We hold that plaintiff can maintain a civil damage action for redress of his statutorily created right to be free from discrimination in private employment, and that this remedy may be pursued in addition to the remedial machinery provided by statute.

## II

The subject matter of Count III of plaintiff's complaint involves an employee's suit against his employer for breach of a collective bargaining agreement. Although state courts have jurisdiction over such suits,[21] it is Federal law which must be applied.[22] It is well settled, as a matter of Federal labor law, that an employee may not maintain an action against his employer for an alleged breach of a collective bargaining agreement where the employee has not first exhausted the grievance and arbitration procedures established under the collective bargaining agreement upon which he bases his suit. *Vaca* v. *Sipes* (1966), 386 US 171, 184 (87 S Ct 903, 17 L Ed 2d 842); *Republic Steel Corp.* v. *Maddox* (1965), 379 US 650, 657, 658 (85 S Ct 614, 13 L Ed 2d 580). This rule has been uniformly followed by the Michigan courts. *Spencer* v. *Wall Wire Products Company* (1959), 357 Mich 296, 299; *Cortez* v. *Ford Motor Company* (1957), 349 Mich 108, 126, 127; *Billings* v. *Levitt* (1968), 10 Mich App

constitutional provision] unlike that of the minority, *was not self-implementing but would require legislative action before it would affect private persons."* See generally Official Record of the 1961 Michigan Constitutional Convention 741–760 (1963) and discussion in Cramton, *supra,* at 26–35. (Emphasis added.)

21 *Charles Dowd Box Co., Inc.* v. *Courtney* (1962), 368 US 502 (82 S Ct 519, 7 L Ed 2d 483); *Smith* v. *Evening News Association* (1962), 371 US 195 (83 S Ct 267, 9 L Ed 2d 246).

22 *Local 174, Teamsters,* v. *Lucas Flour Co.* (1962), 369 US 95 (82 S Ct 571, 7 L Ed 2d 593); *Humphrey* v. *Moore* (1964), 375 US 335 (84 S Ct 363, 11 L Ed 2d 370); *Vaca* v. *Sipes* (1967), 386 US 171 (87 S Ct 903, 17 L Ed 2d 842).

399, 402, 403. But exceptions have been engrafted onto the rule, on the theory that since "these contractual remedies have been devised and are often controlled by the union and the employer, they may well prove unsatisfactory or unworkable to the individual grievant." *Vaca* v. *Sipes, supra.* In the instant case, it is beyond dispute that resort to the higher stages of grievance procedure under the contract is exclusively vested in the union.[23]

The governing Federal standard here is clear. In *Vaca* v. *Sipes, supra,* the United States Supreme Court dealt with the issue of exhaustion of contractual remedies:

"We think that another situation when the employee may seek judicial enforcement of his contractual rights arises if, as is true here, the union has sole power under the contract to invoke the higher stages of the grievance procedure, *and* if, as is alleged here, the employee-plaintiff has been prevented from exhausting his contractual remedies by the union's *wrongful* refusal to process the grievance. It is true that the employer in such a situation may have done nothing to prevent exhaustion of the exclusive contractual remedies to which he agreed in the collective bargaining agreement. But the employer has committed a wrongful discharge in breach of that agreement, a breach which could be remedied through the grievance process to the employee-plaintiff's benefit were it not for the union's breach of its statutory duty of fair representation to the employee. To leave the employee remediless in such circumstances would, in our opinion, be a great injustice." Pp 185, 186.

---

[23] The published agreement between General Motors Corporation and the UAW-AFL-CIO, pp 27–45, presents four steps in the Grievance Procedure, *viz:* Step Two. Appeal to the Shop Committee; Step Three. Appeal to Corporation and International Union; Step Four. Appeal to Impartial Umpire. Even a cursory reading of these rules discloses that the grievant ceases to exercise any significant personal control or influence after the grievance has been referred to the Shop Committee.

Upon determination of a motion for accelerated judgment, well-pleaded facts are accepted as true. *Cortez* v. *Ford Motor Company, supra.* Contents of affidavits may also be considered. GCR 1963, 116.3.

Contrary to the considered judgment of the trial court and reviewing opinion of the Court of Appeals, we conclude, after a careful review of plaintiff's pleadings and affidavits, that plaintiff has sufficiently alleged that his union arbitrarily and with bad faith thwarted his efforts to redress his grievance. This is not a case where the employee attempts to completely by-pass union procedures and file an action in the court against either the employer or the union. The plaintiff's affidavit, if accepted, avers sincere attempts to remedy this grievance by prompt filing of the proper form, but alleges a lack of response and/or interest by the shop committeeman, the local president, the regional representative of the union, and the international union itself. An over-technical scrutinization of the employee grievance form should not substitute for well-pleaded allegations contained in the complaint and affidavit. Carried to its logical absurdity, the form filed by plaintiff on May 27, 1964, does not state any basis for a grievance,[24] but when read in the context of the two previously filed grievances of May 22, 1963, it should have been clear, at least to his sympathetic union leader, that an unjust demotional transfer based primarily upon racial discrimination was being attempted by defendant.

Defendant contends that the reasons asserted in plaintiff's complaint for the union's alleged refusal to process his grievance do not, even when read in

---

[24] Defendant's Exhibit 3 states:
"Nature of Grievance: Protest management removing me from the crane operator group. Demand that I be returned to the crane operator group at once."

a light most favorable to the plaintiff, constitute facts showing unfair representation; also, that Count III at most contains conclusory allegations asserting unfair representation by the union in processing the grievance which he did file, and does not set forth any facts showing with particularity the circumstances constituting the unfair representation or discrimination. Such an argument chooses to wholly ignore the procedural posture in which this case is now before us.

Analytically, the decisions below of grant of accelerated judgment (GCR 1963, 116) were predicated upon special defenses which disposed of the case as distinguished from entry of summary judgment under GCR 1963, 117, which goes to the merits. Because a defense of failure to state a claim must be asserted by motion for summary judgment under GCR 1963, 117 and may not be made by motion for accelerated judgment under GCR 1963, 116, we can express no opinion as to whether plaintiff has alleged a cause of action for unfair representation and restrict our holding in this case to the pleaded defense of exhaustion of remedies.

The defense asserted here, which defendant's motion for accelerated judgment focally draws to our attention, is that of failure to secure relief through *contractual* procedures.[25]   We conclude that plaintiff is correct in his assertion that *Vaca* v. *Sipes, supra,* is controlling, and that plaintiff sufficiently alleged that the union acted arbitrarily in withdrawing his grievance from the contractual

---

[25] We stress that our holding here, dictated in the instant case by controlling Federal law, in no way trenches upon a long line of decisions relating to the necessity for exhaustion of *intra-union,* as distinguished from *contractual,* remedies. See, *e.g., Duffy* v. *Kelly* (1958), 353 Mich 682; *Martin* v. *Favell* (1955), 344 Mich 215; *Holman* v. *Industrial Stamping & Manufacturing Company* (1955), 344 Mich 235. It is evident from the pleadings and affidavit of plaintiff in this case that he did seek intra-union relief.

grievance machinery. It was, therefore, error for the trial court to grant defendant's motion for accelerated judgment, since that motion solely tested the sufficiency of plaintiff's pleadings in terms of the defense of exhaustion of contractual remedies.

The decisions of the trial court and the Court of Appeals are reversed. Costs to plaintiff.

T. M. KAVANAGH, C. J., and ADAMS, T. G. KAVANAGH, SWAINSON, and WILLIAMS, JJ., concurred with T. E. BRENNAN, J.

BLACK, J. (*concurring*). I agree with Justice BRENNAN's conclusion that "plaintiff has sufficiently alleged that his union arbitrarily and with bad faith thwarted his efforts to redress his grievance" (*ante* at p 562). That is enough to call for denial of what in this record is known as a motion for accelerated judgment.*

My vote is cast to reverse and remand for further proceedings consistent with denial of defendant's said motion. Plaintiff should have costs of all three courts, thus far sustained.

---

* For the decision immediately below, see 24 Mich App 60.