7 F.3d 233
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Thomas W. GINN, Plaintiff-Appellant,
v.
WR SOUTHFIELD ASSOCIATES; Hotel Employees and Restaurant
Employees Union, AFL-CIO, Local 24; Dennis M.
Tap, Defendants-Appellees.
 No. 92-2251.
 United States Court of Appeals, Sixth Circuit.
 Sept. 1, 1993.
 
 On Appeal from the United States District Court for the E.D. Mich., No. 91-75524; Friedeuan, D.J.
 Before MARTIN and SUHRHEINRICH, Circuit Judges, and WELLFORD, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 The plaintiff, Thomas W. Ginn, worked for Embassy Suites hotel[1] in Detroit as a line cook. When he was employed by a chef at the hotel, he explained that he could not work the night shift as he was working a night shift at Bennigan's, a local restaurant. The plaintiff believed that he had an agreement with the chef that he would not be called upon to work a night shift at Embassy Suites.
 
 
 2
 Ginn was a member of Local 24, Hotel Employees and Restaurant Employees Union, AFL-CIO (the "union"), which had an exclusive bargaining contract with the hotel. Ginn was rated as a superior or excellent employee while employed at Embassy Suites. The employer, however, in July, 1990, suspended Ginn for five days without pay (unrelated to the episode in controversy). Eventually, the hotel paid him for those five days after the general manager reviewed the incident, but the incident was not removed from Ginn's employee record.
 
 
 3
 The new Embassy Suites' human resources manager, Dennis Tap, also a defendant, then scheduled the plaintiff for an overtime shift on a forthcoming Saturday night. The plaintiff promptly discussed his conflict of two jobs with then Chef Fiebke who explained that he did not make the schedule, but that Tap did. Ginn spoke with Tap and reminded him of his arrangement with the former Chef, Dixon, that he would not be scheduled for a night shift. Tap informed Ginn that he must work as a replacement on the assigned shift, and that if he did not, he would be terminated. Ginn complained that he had more seniority than Jeff Harper, who should be assigned to the Saturday night shift. Tap again informed Ginn that he must work, as assigned.
 
 
 4
 Ginn, who is black, then went to the vice-president of the defendant union, Henry Crawford, to make his complaint, explaining that he wanted to bump Harper. At that time, he complained that he felt that this incident indicated racial discrimination by the hotel management. Crawford told Ginn to "wait and see what happens," but warned that he might be terminated on July 21, 1990, the Saturday night in controversy, if he did not report.
 
 
 5
 The plaintiff did not show up for work on July 21, 1990, instead working at Bennigan's. Neither did he report for work on the following Sunday, July 22, 1990. He claimed that he was told he would be terminated on Saturday and saw no reason to come to work Sunday despite the fact that he was scheduled to work that day.
 
 
 6
 Ginn returned to the hotel a few days later to gather his personal belongings. He was directed to Mr. Tap's office. There, Tap conducted the plaintiff's exit interview. According to the plaintiff, Tap spoke to him in a belittling and demeaning manner. Tap documented the termination, changing the termination date from July 21 to July 23 and listing the reason as "no call, no show" for July 22. The notice reflected also that the plaintiff had been warned of the consequences on July 17, a day the plaintiff claimed he did not work.[2] Tap was the only one to sign the notice of termination.
 
 
 7
 The plaintiff filed a grievance within a few days, and was represented exclusively by the union. Ginn complains that union representative Crawford encouraged him to settle his grievance. Crawford, however, testified that he encouraged Ginn because he thought discharge was too severe a penalty for the offense, and that he encouraged him to drop the previous grievance concerning the five day suspension. When the employer denied the grievance, the union requested arbitration. The parties were unable to agree on an arbitrator from the first list. The union then requested a second list from which Father J. Richard Dempsey was chosen as the arbitrator.
 
 
 8
 The arbitrator determined whether the plaintiff was discharged for sufficient cause. The arbitrator, after presenting both sides of the argument, denied the grievance:
 
 
 9
 There is no doubt from the testimony that Ginn directly refused to carry out on instruction of management when he did not come to work on the evening of July 21. It is also clear that he knew the possible consequences of such an action.
 
 
 10
 The order/job assignment was reasonable. The Hotel needed two cooks to cover the Saturday evening meal and chose the least senior (Ginn) when the most senior available line cook declined.
 
 
 11
 The grievant, therefore, never followed the basic labor-management principle of following the allegedly unfair instruction or order and then grieving it. He filed his grievance too late and therefore it is denied.
 
 
 12
 Moreover, the grievant's claim that the Hotel had promised to issue an order such as required the grievant to fill in on Saturday night was not substantiated by sufficient proof to make the Hotel's request clearly an unreasonable one.
 
 
 13
 The plaintiff claimed before the district court that (1) this arbitration decision did not draw its essence from the Collective Bargaining Agreement ("CBA"); (2) that the union, also named as a defendant, breached its duty of fair representation because, among other things, it failed to appeal the arbitration order; (3) that he was a victim of racial discrimination; and (4) that he suffered from intentionally inflicted emotional distress. The district court granted defendants summary judgment after a hearing on the matter. The plaintiff now appeals.
 
 The CBA provided in relevant part:
 
 14
 Section 28. This section defines the normal work and provides the basis for calculation of overtime.
 
 
 15
 ....
 
 
 16
 (d) The Employer agrees that it will not reschedule an employee's regularly scheduled day or days off except where business conditions make rescheduling necessary for the efficient operation of the Employer's business. Should the Union claim that changes in the schedule of hours result in any abuses of the rights of the employees set forth in Sections 27 and 28 of the is Agreement, the claim shall be subject to the grievance and arbitration procedures set forth in Sections 38 and 39 of this Labor Agreement.
 
 
 17
 (e) In the scheduling of work, the Employer shall make every effort to schedule in accordance with occupational seniority.
 
 
 18
 ....
 
 
 19
 Section 30. An employee shall be disciplined or discharged on for sufficient cause. When an employee has been suspended or discharged, the Union shall be notified immediately in writing.
 
 
 20
 Warning notices not resulting in suspension issued to an employee shall become null and void one (1) year after the date of issuance and may not thereafter be used as a basis for or in support of any subsequent discharge or disciplinary action.
 
 
 21
 Section 31.
 
 
 22
 ....
 
 C. SENIORITY
 
 23
 Seniority shall be determined by the length of the employee's service since the last date of hiring. The length of an employee's service is determined by his continuous service with the Employer, composed of the time actually spent on the payroll plus time lost when an employee for less than six (6) months at any time is either sick, injured, pregnant, or laid off due to curtailment of operations....
 
 
 24
 ....
 
 
 25
 Section 38. Differences of opinion of disputes between representatives of the Employer and any employee of Union Representative regarding interpretation or alleged violation of any provision of this Agreement may become the subject of arbitration only after all steps of the grievance procedure have been utilized and have failed to produce accord between the parties. Arbitration extends to any employee aggrieved.
 
 
 26
 Section 39.
 
 
 27
 ....
 
 
 28
 (d) If the matter is not resolved in Step (c), then either the Local Union or the Employer may refer the matter to arbitration.... The arbitrator shall be specifically limited on determining issues involving the interpretation or application of the terms of this Agreement ... and shall have no authority to add to or subtract from or change existing wage rates or any of the other terms of this Agreement. The award of the arbitrator shall be final, binding, and conclusive on all parties.
 
 
 29
 We review the grant of summary judgment de novo, and we have stated and considered the evidence in a light favorable to the non-moving party.
 
 I. DISCRIMINATION
 
 30
 Ginn claims, in essence, that he was discharged not because he failed to show up for work but because he was black. He claims he was more senior than a white co-worker, Harper, who declined to work on the Saturday night in question.
 
 A. Claim of Disparate Treatment
 
 31
 A plaintiff claiming race discrimination in Michigan must present a prima facie case of discrimination as required by the Michigan Elliot Larsen Act. See Pitts v. Michael Miller Car Rental, 942 F.2d 1067 (6th Cir.1991). Ginn claims disparate treatment and thus, in order to satisfy his burden of proof he must show:
 
 
 32
 That he ... was a member of the class entitled to protection under the Act, and that, for the same or similar conduct, he ... was treated differently than one who was not a member of the protected class.
 
 
 33
 Id. at 1070 (citing Sargent v. International Bhd. of Teamsters, 713 F.Supp. 999, 1014-15 (E.D.Mich.1989) (citing Pompey v. General Motors Corp., 385 Mich. 537, 549, 189 N.W.2d 243, 250 (1971))). Ginn then must show that he was replaced by someone outside the protected class. If, and when, the plaintiff meets his burden, then the burden shifts to the defendant to articulate a legitimate reason for the disparate treatment.
 
 
 34
 We find no error in the district court's decision. The defendants have shown that another employee, who was white, was discharged one week prior to Ginn's discharge for refusing to work an assigned shift. The very cook who was scheduled to work on July 21, 1990, was fired for this reason. Accordingly, the hotel needed another cook to work that night. In light of this uncontested fact, there is no demonstrated disparate treatment. The plaintiff has not been able to show that he was treated differently from a white employee.
 
 B. Seniority
 
 35
 The plaintiff challenges the arbitration decision that Harper was more senior than he was. He claims it was error not to require defendant Embassy Suites to look to Harper to work Saturday night. The CBA requires that the hotel ask the more senior employee to work and if that employee does not want to work, then the less senior employee must work that shift.
 
 
 36
 According to union records, Harper had been working continuously since November of 1988, while Ginn had been working continuously since April of 1989. Harper was more senior than Ginn, according to this information. Ginn, however, argues that Harper also worked somewhere else during his tenure at the hotel. Ginn was not able to prove to the union or to the satisfaction of the arbitrator that Harper's employment at the hotel was not continuous.[3] The arbitrator determined that Harper did not want to work the July 21 shift and that management assigned the plaintiff that shift. We find no error in that determination.
 
 C. Intentional Discrimination
 
 37
 The plaintiff also alleges intentional discrimination on Tap's part. In order to satisfy his burden, the plaintiff must prove that the defendant was predisposed to discriminate against black persons and acted upon that predisposition. Pitts v. Michael Miller Car Rental, 942 F.2d 1067, 1070 n. 1 (6th Cir.1991).
 
 
 38
 The plaintiff failed to present such evidence. Tap did not begin work at Embassy Suites until July 11, 1990, just 10 days prior to Ginn's termination. The plaintiff has not shown that Tap had a predisposition to discriminate, having worked at Embassy Suites for only a few days before his dismissal. Ginn did not present evidence of any other complaints of racial discrimination filed against Tap, or even any charges of racial animosity against Tap before he began working at Embassy Suites. There was no error in the conclusion that Ginn failed to show a predisposition of racial animus on the part of any defendant.
 
 
 39
 In addition to our foregoing discussion, we note that the CBA provided that the arbitrator's decision should be binding and conclusive. The arbitrator found that the plaintiff had no legitimate grievance against his employer by reason of the discharge. The district court properly granted the defendant's motion for summary judgment based upon racial discrimination.
 
 
 40
 II. CLAIM OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
 
 
 41
 We have reviewed Michigan law on emotional distress as discussed in Pratt v. Brown Machine Co., 855 F.2d 1225 (6th Cir.1988). The Michigan Supreme Court has not recognized the tort of intentional infliction of emotional distress, but the Michigan Court of Appeals in Roberts v. Auto-Owners Ins. Co., 374 N.W.2d 905 (Mich.Ct.App.1985), adopted it as it appears in section 46, Restatement (Second) of Torts. The latter provides that one is liable for extreme and outrageous conduct which "intentionally or recklessly causes severe emotional distress to another." The comments to the Restatement make it clear that mere insults or indignities are not enough to constitute outrageous conduct.
 
 
 42
 A plaintiff must establish four elements to prevail on such a claim, including extreme and outrageous conduct, intent, causation, and severe emotional distress. Pratt, 855 F.2d at 1239. Tap's comments could not, as a matter of law, reach a level of extreme and outrageous conduct, nor could the plaintiff show any physical signs of emotional distress. The plaintiff claims that he separated from his wife because of the emotional distress and that he "lost motivation to seek additional employment after being fired by" the hotel. He further claimed loss of sleep, insomnia, and nightmares. We find that these claims fail to satisfy the elements of emotional distress under Michigan law.
 
 
 43
 In Roberts, the plaintiffs were "disappointed", "mad", and "upset". Roberts, 374 N.W.2d at 912. The Michigan court decided that this kind of conduct producing such reaction did not constitute actionable emotional distress. The district court properly granted the defendants summary judgment on this issue.
 
 
 44
 III. PLAINTIFF'S CLAIM OF BREACH OF FAIR REPRESENTATION
 
 
 45
 The plaintiff alleges that the union did not fairly represent him but, in essence, the plaintiff is challenging the outcome of arbitration under a CBA. This court reviews labor arbitration awards on a very limited basis. Interstate Brands v. Chauffeurs, Teamsters Local 135, 909 F.2d 885 (6th Cir.1990) (citing to United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29 (1987)), cert. denied, 111 S.Ct. 1104 (1991). Essentially, we look to satisfy ourselves that the award draws its essence from the CBA. Id. at 888. "This highly deferential standard of review is perhaps most commonly extended to the substantive issue of what constitutes sufficient and reasonable cause for discharge." Id. at 889.
 
 
 46
 In order to satisfy his burden, the plaintiff must establish a breach of the union's duty of fair representation and "the breach must have contributed to the arbitrator's making an erroneous decision." Wood v. Int'l Broth. of Teamsters, 807 F.2d 493, 500 (6th Cir.1986), cert. denied, 483 U.S. 1006 (1987). The union presented to the arbitrator all of the arguments that the plaintiff claims as error in this appeal, except for the seniority challenge which the arbitrator addressed. The plaintiff did not present any evidence to indicate how the arbitration award was affected by any alleged failure on the union's part. Summary judgment was appropriate in this respect also. See Vaca v. Sipes, 386 U.S. 171 (1967).
 
 
 47
 IV. PLAINTIFF'S CLAIM OF BREACH OF THE COLLECTIVE BARGAINING
 
 AGREEMENT
 
 48
 In order to establish that the hotel breached its CBA, the plaintiff must first establish that the union breached its duty of fair representation. See DelCostello v. Int'l Broth. of Teamsters, 462 U.S. 151, 165 (1983). The plaintiff has failed to establish that the union breached its duty of fair representation as discussed in the previous section. The plaintiff has also failed to show that Embassy Suites or Tap violated the agreement.
 
 
 49
 We AFFIRM the district court's judgment in its entirety.
 
 
 
 [1]
 Defendant, WR Southfield, operated as Embassy Suites
 
 
 [2]
 The warning notice explained that Tap warned the plaintiff on July 17 that he must work overtime and, if not, he would be terminated
 
 
 [3]
 Ginn presented affidavits of two fellow co-workers to the effect that Harper resigned from his position to work somewhere other than the hotel and then returned to the hotel at a later date. One of those co-workers contradicted his affidavit during his deposition. Moreover, Crawford, vice-president of the union, testified that Harper took a personal leave which entitles him to keep his seniority. The plaintiff did not present any employment records to the contrary. The plaintiff has not met his burden of proof to overcome the presumption of correctness of the arbitrator's award on this issue