**Paul FLAIG, Jr., Plaintiff,**

v.

**The BENDIX CORPORATION, a Delaware Corporation, Defendant.**

**Civ. A. No. 78–71018.**

United States District Court,
E. D. Michigan, S. D.

March 31, 1980.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

ANNA DIGGS TAYLOR, District Judge.

Plaintiff filed his Complaint in this lawsuit on April 27, 1978, alleging that on June 14, 1975, defendant had discharged him from its employ for the reason that he was a white male, in order to replace him with one Richard Cunningham, a black. Plaintiff sought the jurisdiction of this Court pursuant to Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e et seq., the Michigan Fair Employment Practices Act, M.C.L.A. §§ 423.301, 303(a) now § 37.-2202(1)(a), Article I, § II of the Michigan Constitution, and the "Michigan common law." He claims diversity of citizenship, based upon his undisputed Ohio residence and defendant's Michigan incorporation, and consequent jurisdiction in this court of his state claims under 28 U.S.C. § 1332(a). This court finds that it has such jurisdiction.

■ Inasmuch as Plaintiff had pursued neither requisite state nor federal administrative remedies prior to filing this lawsuit, he abandoned his Title VII and Michigan F.E.P. statutory claims prior to trial. There remains for adjudication the claim which the Supreme Court of Michigan recognized in *Pompey v. General Motors*, 385 Mich. 537, at 553, 189 N.W.2d 243, at 251, as follows:

"Although there is some authority to the contrary, most decisions have held that a person aggrieved by the violation of a civil rights statute is entitled to pursue a remedy which will effectively reimburse him for or relieve him from violation of the statute, notwithstanding the statute did not expressly give him such right or remedy."

Accordingly, plaintiff here, as a statutorily time-barred plaintiff was permitted to do in *Pompey, supra*, seeks redress of his statutorily created right to be free from employment discrimination in the State of Michigan.

Lawrence S. Katkowsky, Southfield, Mich., for plaintiff.

A. David Mikesell, Detroit, Mich., for defendant.

Plaintiff further demanded a trial by jury, damages consequent upon a forced relocation in another state, and for anguish, humiliation, and anxiety, past and future, as well as punitive and exemplary damages.

Defendant filed a Motion for Summary Judgment, which was denied on January 29, 1980, there being genuine issues of material fact. Defendant also filed a motion to strike Plaintiff's Jury Demand and claim for exemplary and punitive damages, which was granted on February 5, 1980. Plaintiff's subsequent Motions to stay proceedings and to permit an interlocutory appeal were denied on February 12, 1980. Trial to the court was then had for three days commencing February 20th, 1980.

Plaintiff presented the testimony of three witnesses: himself, Alexander Michalowski, the custodian of certain of defendant's personnel records; and the deposition testimony of a co-worker, Merrill Sehulster. Defendant then moved to dismiss, pursuant to F.R.C.P. 41(b), which motion was taken under advisement. Defendant thereafter presented the testimony of Richard Bourgerie, the Vice-President and Director of the Materiels Department in which Plaintiff had worked; Richard Cunningham, the black man whom plaintiff alleges to have replaced him; Perry Anderson, the manager of defendant's corporate personnel data system; William F. Adair, III, the manager of the Graduate Development Program under which both plaintiff and Mr. Cunningham were hired at Bendix; and Elizabeth Piendak, a co-worker of plaintiff.

There is no dispute but that, as was decided in *McDonald v. Santa Fe Trail Transport Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), Title VII prohibits the discriminatory discharge of a white employee from his job while a similarly situated black is retained, on the same standards as would be applicable if the employee discharged were black, and the favored employee white. There is also no dispute but that the applicable standards in both cases, and in this lawsuit, are those of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Michigan courts look to federal law for the principles applicable to an employment discrimination claim brought under Michigan Law. See *Civil Rights Commission v. Chrysler*, 80 Mich.App. 368, 263 N.W.2d 376 (1977). The standards of *McDonnell Douglas, supra*, concern the order and allocation of proof in a private, non-class action suit challenging employment discrimination. The model recommended by the court through that decision, which was tailored to a hiring situation but is almost universally applicable, is as follows:

"The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing, (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."

\*　\*　\*　\*　\*　\*

"The burden must then shift to the employer to articulate some legitimate, non-discriminatory reason for the employee's rejection." (411 U.S. at 802, 93 S.Ct. at 1824.)

Finally, *McDonnell Douglas* held, the employee must be afforded the opportunity to show that "the presumptively valid reasons for his rejection were in fact a coverup for a racially discriminatory decision." (411 U.S. at 805, 93 S.Ct. at 1826).

The Sixth Circuit, in *Long v. Ford Motor Co.*, 496 F.2d 500 (1974), has instructed District Courts on the application of *McDonnell Douglas* principles to a case of alleged discriminatory discharge. It wrote, 496 F.2d at 505, that the plaintiff:

". . . must first establish that his employment terms vary from those which his employer accords to similarly situated white workers. This can be shown by proof either that intentional racial prejudice entered into his treatment or that a

facially neutral practice (here Appellant's performance evaluation system) operated discriminatorily against minority employees. In this case, Appellee may be able to establish that he was trained inadequately whereas white co-employees were trained adequately. He may be able to establish that Ford's promotion system, which relies heavily upon the subjective evaluation of supervisors, has a discriminatory impact on minority employees, so that its use in discharging him was improper. Appellee may be able to establish that similarly situated white employees with comparable records would have been offered different positions within Ford rather than discharged, whereas he was forced to leave Ford altogether." (496 F.2d at 506.)

■ The above-quoted decisions illustrate the flexibility of approach available to the plaintiff in an employment discrimination case, in meeting his initial burden of putting forward a prima facie case. This court finds, however, that the plaintiff herein has failed to meet that burden by the requisite preponderance of the evidence. Although the first element, the fact of his protected status under applicable Civil Rights laws as a white man, is undisputed, plaintiff has failed to prove that he was performing his job satisfactorily and given a poor evaluation for discriminatory reasons; that he was terminated to make a place for a black or was in fact ever replaced by a black; that he was terminated even in part because of his race; that defendant's facially neutral performance evaluation system operates discriminatorily against the group of which he is a member; that he was trained less adequately than were black employees in his situation; or that black employees with comparable records would have been offered different positions within the company rather than discharged, as he was. The above listing encompasses all of the varying elements of a prima facie case which have been argued by these parties as appropriate, as well as those elements suggested by the Supreme Court in *McDonnell Douglas* and our Circuit Court in *Long, supra.* In short, the court finds that plain-

tiff has failed of proving any element of a prima facie case save his protected status under the law, by any applicable theory.

Plaintiff Paul Flaig's first day of work in Bendix Corporation's Graduate Development Program was September 15, 1974. He had been a June, 1974, graduate of the Master of Business Administration program of the University of Cincinnati, having so distinguished himself as an undergraduate in Mechanical Engineering that he was granted a full tuition scholarship for his graduate studies. He had simultaneously worked, fulltime, as capital equipment purchasing manager of a Cincinnati engineering firm. In August, 1974, in response to plaintiff's inquiry, defendant's university recruiter invited him to the Bendix Corporate Headquarters in Southfield, Michigan, where he was interviewed by the Personnel Department's manager of the Graduate Development Program, William F. Adair, as well as by the Vice-President of the Materiels Group and the Director of one of that Group's three Departments, the Purchasing Department. Mr. Adair hired plaintiff into the program on August 12, 1974, and assigned him to the position of staff assistant to Richard Wright, Director of Purchasing.

The Graduate Development Program at Bendix was the full responsibility of Adair, who reported to Personnel Director Rickus. Adair described the program as one designed to provide for the future management of the corporation by recruitment of "fast-track" M.B.A. graduates, keeping them on the payroll and budget of the Personnel Department, and assigning them as staff assistants to Group Vice Presidents and Department Heads within the Southfield Corporate Headquarters for approximately eighteen months. The young people were highly exposed to the corporate officers at Southfield as well as to the corporation's division management across the country, and were expected to exhibit a high degree of resourcefulness, initiative, and general excellence. They were hired at the highest starting salaries in the country for their qualifications. Indeed, plaintiff's starting salary was higher than Adair's.

Their starting salaries were also far higher than those of the usual starting M.B.A. at Bendix; and their movement into significant management positions within the operating divisions at the end of eighteen months was a far more rapid rise than could be expected of the usual M.B.A. career ladder at Bendix. Also, as Adair explained to plaintiff at their interview, a far higher risk of failure attached to the participant in this program because of its higher expectations, than to the usual starting M.B.A.

Adair did all hiring and firing for the Graduate Development Program, as he did with plaintiff, and made assignments of the Graduates to the Corporate Groups. Prior to the commencement of every fiscal year (the Bendix fiscal year being October 1 through September 30), and specifically prior to fiscal 1975, the Group Vice Presidents at Corporate Headquarters placed their requests, specifications, and proposed assignments for Graduates with Adair, at the Personnel Department. For 1975, Vice President Bourgerie of the Materiels Group requested two, as were requested for that Group in all years known to this record. Adair and Personnel Director Rickus reviewed all requests and then determined the allocation of the Graduates for the year under consideration.

For the Fiscal year 1975, and at least the years immediately preceding and thereafter, the Materiels Group, under Vice President Bourgerie, was allotted two Graduates, as requested. Accordingly, plaintiff's argument that he was discharged to make room for a black, Richard Cunningham, in that Group, does not hold water. The court finds that plaintiff was not discharged to make room for Cunningham. The Materiels Group consisted of three Departments, one of which was Purchasing. At some times there was only one incumbent Graduate in Materiels; and at other times both of the two allotted positions were filled. Also, for some periods both of the Materiels Group's graduates were in the Purchasing Department; and at other times they were separated. There was always, however, an allocation for two within the Group, however distributed. When plaintiff entered the Materiels Group in September, 1974, he joined Douglas Godfrey, and the two filled the allocation until February, 1975, when Godfrey departed for the management of an operational division. The Court finds that Richard Cunningham, a black, was made a formal offer by Adair on March 5, 1975, and filled the vacancy left by Godfrey. The Cunningham Personnel requisition was dated April 7, 1975, and stated that it was to become effective August 1, 1975.

Cunningham had been interviewed by the Bendix university recruiter in November, 1974, at the University of Chicago, where he expected to obtain his M.B.A. that June. He had worked as a janitor full-time at Proctor and Gamble while working toward his B.S. in Industrial Management in 1973 at the University of Cincinnati, and had been one of "around fifteen" blacks in his class of three hundred fifty at the University of Chicago. In January, 1975, he was invited to be interviewed at Bendix Southfield Headquarters by the Personnel Department and in his area of expressed interest: Materiels. Cunningham arrived to work at Bendix after his graduation, on July 1, 1975.

Both Cunningham and plaintiff worked in the Purchasing Department of the Materiels Group. After plaintiff had been discharged on July 16, 1975, Richard Nelson was hired in December, 1975, to replace him as the second Graduate in the Materiels Group and in the Purchasing Department. The record further indicates that, prior to plaintiff's 1974 arrival in the Purchasing Department, Godfrey had worked there together with a Graduate named Miller, for approximately eighteen months. Clearly, the Materiels Group was free to place both of its Graduates within the Purchasing Department, as desired, and was always allotted two Graduates.

Plaintiff has further argued that a hiring freeze at Bendix, commencing August 11, 1975, required that he be discharged to make room for Cunningham in the Purchasing Department. Although the inauguration of a freeze at any time was uniformly

denied by the Bendix witnesses, the court notes that Cunningham had been working and that plaintiff had been gone for a month prior to the effective date of the alleged freeze, and that it could have had no bearing upon plaintiff's discharge. Moreover, Nelson was hired later in 1975 to replace plaintiff, further refuting the allegation of a freeze.

Accordingly, the simple chronological order of events refutes every aspect of plaintiff's argument that he was replaced by Cunningham, and lends extrinsic credit to the testimony of defendant's witnesses. The calendar also refutes the argument that the poor performance review which was given to plaintiff at the time of his July discharge was a fabrication, devised to support his discriminatory discharge and to make room for Cunningham in the Purchasing Department. If defendant's managers were given to fabrication of a performance review, they would have applied those efforts to plaintiff's *April* performance review, which followed immediately on the heels of their March hiring of Cunningham. That review gave plaintiff high ratings on his work to that date, which had largely been confined to the offices of the Personnel Department. The court finds that it was a series of events arising from plaintiff's subsequent activity among the divisions, and reflecting poorly upon plaintiff's suitability and performance, that resulted in the later negative evaluation which precipitated his discharge in July.

Plaintiff's first performance review form was presented to him by Mr. Wright on April 14, 1975, and had been presigned by Vice President Bourgerie. It rated plaintiff as outstanding in technical proficiency, superior in 19 other categories, and satisfactory in seven. He had to that point been principally engaged in two major tasks: preparation of an Annual Dollar Disbursement book, which was to be completed by May 1, 1975; and development of a procedural manual by which Bendix divisions were to anticipate price increases, entitled "Commodity Price Forecast Program." A second draft of that manual had just been completed, and plaintiff was that week commencing a series of instructional trips to Bendix divisions to implement the program. The balance of his duties had been less significant, and altogether internal to the Purchasing Department.

The court finds that, after that evaluation, plaintiff's travels to the divisions on behalf of the Commodity Price Forecast Program resulted in a number of complaints from the divisions which led his supervision, and ultimately Mr. Adair, to the conclusion that plaintiff was not suitable to either the Graduate Development Program or defendant's general corporate needs.

Elizabeth Piendak had been an originator of the Price Forecasting Program at her Group level, and plaintiff met with her at the South Bend Brake and Steering Division on a May, 1975, visit, at the direction of Purchasing Director Wright. Plaintiff was instructed to seek her input into the corporate implementation of the program. She testified that she became alarmed, at that time, that the entire program would be undermined if plaintiff were to present it at the plant level. Indeed, she felt that his disparaging of Mr. Wright and the competence of the corporate Purchasing Department, as compared to his own superior competence, would send the leadership of the headquarters Materiels function down the drain. She immediately contacted Messrs. Wright and Bourgerie and advised them of her concerns.

Vice President Bourgerie testified that he had participated in the decision to hire plaintiff, signed his first evaluation, and participated in the discharge process. In May and June, 1975, after reports from Ms. Peindak, and other calls from divisions in South Bend, St. Joseph, Michigan, and the B.A.C. Division in Windsor, Ontario, he grew concerned and a serious question was raised in his mind concerning plaintiff's performance. He had been asked by some not to send plaintiff back, and told by others that plaintiff "was all talk and no listening," and that plaintiff was "wasting everyone's time." These reports caused him to request Wright to completely reeval-

uate plaintiff's work; and Wright reported that his office work was now marginal.

Bourgerie then, in early July, told Adair that there was no room in the Materiels Group for plaintiff. He was creating animosity in the field, and there was no reasonable expectation that he could ever be placed in a field management job, for Materiels. Bourgerie further told Adair that plaintiff had a serious external communications problem, and that his mannerisms had made him an office joke.

Adair's testimony was that, from May through June of 1975, plaintiff's job performance was called into question. Bourgerie and Wright advised him of allegations that plaintiff was disparaging the corporate office, on his field trips. Adair, inasmuch as plaintiff was his responsibility, decided to double-check. He called the Materiels Director and Purchasing Agent at the South Bend Division, and was told that plaintiff was talking against Wright, the Materiels Group, and the entire Southfield Corporate Headquarters; and of their opinions that he was a "strange bird," and "a flake."

Adair, whose testimony as to his efforts this court gives great credit, then said that this difficult situation caused him to speak directly with plaintiff about the necessity that plaintiff convey a perception to the divisions of strength and responsibility in all corporate functions. Plaintiff, he said, was totally unaccepting of his discussion. At trial, plaintiff denied such a conversation.

Adair then returned to Wright and Bourgerie, with whom the joint conclusion was reached that plaintiff could not remain in the Materiels Group. Adair then had the responsibility for either placing plaintiff elsewhere in the Graduate Development Program or elsewhere among the divisions in an ordinary M.B.A. position. He concluded that, after the broad exposure plaintiff had already received, in an unfavorable light, and inasmuch as no division would accept him without a recommendation from his present supervision, there was no place at all for plaintiff at Bendix. The matter was then discussed with his superior, Rickus, and it was determined that plaintiff must be discharged. Wright then prepared a second performance evaluation form, which reflected an unsatisfactory performance, and which was presented on July 14, 1975. Adair discharged plaintiff on July 16, 1975.

Plaintiff points to the fact that his supervisor, Mr. Wright, obtained a bonus in Fiscal 1975 for meeting his 13 pre-set goals for that year, which included:

"3. Include in the professional staff one minority or female in FY 75."

Wright's meeting of that goal, among twelve other goals, is suggested by plaintiff to be evidence that he was fired to make room in the Purchasing Department for Cunningham. The court finds, however, that plaintiff's discharge had no impact on that bonus, because Wright was free to "include" Cunningham without firing plaintiff. It is noteworthy that after plaintiff's discharge, Materiels still had the allocation for two Graduates, and by December, 1975, had placed the requisition for plaintiff's replacement, Nelson, to work in Purchasing with Cunningham.

Also, it was not Wright but Adair, who could or did make the ultimate decision that plaintiff be discharged, rather than transferred. Plaintiff was, after all, on the Personnel Department payroll as a member of its Graduate Program. Adair testified that although he did not know of the goals on which Wright's bonus depended, Bourgerie had told him, at the time of his Fiscal '75 request, of his hope that a minority or female might be located for Materiels. But the record is barren of any suggestion of a bonus or other reward to Adair for either locating minorities in general, for Materiels in particular, or for Cunningham in this case. Indeed, there is no evidence of any "affirmative action" component in the Graduate Development Program, and the incentive to a more willing acceptance of the presence of minorities here offered to line supervision, in the person of Mr. Wright, which both parties entitle "affirmative action", is the only evidence of such a program in the record.

The court finds that the reasons for plaintiff's discharge were those described at trial by Piendak, Bourgerie and Adair. Plaintiff's shortcomings in external communications only became apparent after his first evaluation. He refused to accept Adair's corrective approach; and indeed it was his testimony at trial that there was absolutely nothing about his job performance which was susceptible to any degree of criticism. The decisions leading to plaintiff's discharge were well-considered and, although this court need not find a just cause discharge, but only a nondiscriminatory one, it finds no taint of the unfair, which would render it suspect.

In accordance with these findings of fact and law, IT IS ORDERED that Plaintiff's complaint be and it hereby is DISMISSED.