Amos **COTTON, Jr.** and **Lucille Cotton, Plaintiffs,**

v.

Garfield **MINTER** and **Barbara Frazier, Defendants.**

Civ. A. No. 78–72729.

United States District Court, E. D. Michigan, S. D.

April 11, 1979.

Rader, Eisenberg & Feldman, P. C., by Jeffrey H. Feldman and Ronald Rader, Detroit, Mich., for plaintiffs.

Plunkett, Cooney, Rutt, Watters, Stanczyk & Pedersen by Larry Mason, Detroit, Mich., for defendants.

## OPINION

FEIKENS, District Judge.

## FACTS

Plaintiffs are husband and wife, both Michigan residents. Defendants reside in California. This case was removed to Federal Court because of diversity of citizenship.

Its genesis is an automobile accident which occurred on July 6, 1978 in Grand Rapids, Michigan. On that day AMOS COTTON, JR. and his wife, LUCILLE, were riding in their automobile when the Defendants allegedly negligently collided with them. Mr. Cotton claims to be an "injured person" within M.C.L.A. § 500.-3135(1), and he sues for "noneconomic loss" pursuant to M.C.L.A. § 500.3135(2)(b). His wife was not physically injured, but claims loss of consortium as a result of her husband's injuries.

Defendants move for partial judgment on the pleadings pursuant to Rule 12(c) F.R. C.P., seeking to have Mrs. Cotton's claim for loss of consortium stricken, as barred by Michigan's no-fault automobile insurance statute. M.C.L.A. § 500.3101, *et seq.*

## DISCUSSION

Section 500.3135(1) provides

". . . a person remains subject to tort liability for noneconomic loss caused by his ownership, maintenance or use of a motor vehicle only if the injured person has suffered death, serious impairment of bodily function or permanent serious disfigurement."

Section 500.3135(2)(b) abolishes tort liability for noneconomic loss except as expressly provided for in subsection (1). Defendants argue that subsection (1) should be read as allowing *only* the "injured person", as that term is defined, to bring suit for noneconomic loss. Plaintiffs assert that once someone is "injured" within § 3135(1), a defendant loses his tort immunity for all losses proximately caused by his negligence, including the derivative liability at issue here. No appellate court in Michigan has decided this question although both parties cite Circuit Court opinions.

The no-fault act was designed to alleviate several problems that developed under the "fault" system of recovery, namely, long payment delays, an inequitable payment

structure, high legal costs and an overburdened court system. *See Shavers v. Attorney General,* 402 Mich. 554, 578, 621–22, 267 N.W.2d 72 (1978). Although the existence of consortium damages could have contributed to some of these problems (i. e., high legal costs and an over-burdened court system), its impact would have been small compared to the difficulties attributed to the tort system itself. Thus, the purpose of the act does not seem to indicate an answer to the question.

█ The language of the pertinent statutory sections is not dispositive either. It can be argued that in § 500.3135(1) the legislature was mainly concerned with ensuring that the principally injured person retained his ability to recover in tort and its silence as to persons suffering derivative injuries implies they are to be barred. This is unsatisfactory. It would place a heavy meaning on legislative silence. This is especially inappropriate for the language at issue is equally susceptible of the construction Plaintiffs urge. Moreover, statutes which abolish the common law should be construed narrowly. *Bandfield v. Bandfield,* 117 Mich. 80, 82, 75 N.W. 287 (1898), *Watson v. Aquinas College,* 83 Mich.App. 192, 195–6, 268 N.W.2d 342 (1978). (*See Rusinek v. Schultz,* No. 76–40920–NI, Genesee County Circuit Court) Loss of consortium is a well established element of damage at common law. *Burns v. Van Laan,* 367 Mich. 485, 488, 491, 116 N.W.2d 873 (1962); *Montgomery v. Stephan,* 359 Mich. 33, 101 N.W.2d 227 (1960); *Whitson v. Whiteley Poultry Co.,* 11 Mich.App. 598, 601, 162 N.W.2d 102 (1968).

█ There is another consideration which influences me to adopt the Plaintiffs' position. The purpose of no-fault will be as well served by declining to abolish consortium as by abolishing it. No-fault's purpose was to litigate only cases where there are serious elements of noneconomic loss and bar those where such losses are small. Abolishing consortium would exclude no cases, and allowing it would not open the door to additional cases. In each case the test whether suit may be brought is: Has there been "injury" within the meaning of § 500.3135(1)?

An analogous case is also persuasive. In *Cole v. Bissett,* No. 76–2899–NI, Wexford County Circuit Court (opinion dated August 8, 1978) (cited by Defendants), Judge Walter Ransom held that no-fault had abolished consortium. The plaintiffs argued that if loss of consortium was abolished, then by the same reasoning wrongful death actions would also have to be abolished. Both are derivative actions in which a person other than the one primarily injured sues for damages which, though a result of an injury to one "injured" within § 3135(1), are not suffered by the injured person. Judge Ransom rejected this argument by distinguishing the wrongful death action as one in which, because the injured person is dead and cannot sue, recovery is *of necessity* by another (namely, those personal representatives of the deceased entitled by M.C.L.A. § 600.2922(2) (1978–79 Supp.) to bring suit). However, I think the position urged by plaintiffs in *Cole v. Bissett* has merit. Loss of consortium is derivative in exactly the same way as wrongful death. That is, it must of necessity be brought by one other than the one primarily injured. Loss of consortium is always suffered by the spouse of the injured party. It appears that the real reason one rebels against abolishing wrongful death and not consortium is that the latter has sometimes been regarded as a spurious or disreputable kind of damage, not susceptible of hard proof nor ever amounting to much in dollar terms, yet included as a makeweight in any complaint for personal injury. Wrongful death, on the other hand, is recognized as a serious harm and often carries a high provable dollar value.

## THE PROBLEM OF UNSETTLED STATE LAW

█ In deciding this issue I am mindful of the problems faced by a federal court sitting in diversity facing an issue of first impression. Under *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) and its progeny, I am to

apply the law of the forum state in diversity matters. *Byrd v. Blue Ridge Electrical Coop., Inc.,* 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958); *Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). I must thus decide an issue of state concern, but I am not reviewable in the state's appellate courts.

The problem has been addressed on numerous occasions. Professor Wright has said:

Inevitably situations will arise where there is no state law of any kind on the particular point involved. It is probably still true, as clearly held in 1943, that a federal court cannot decline jurisdiction of a case simply because it is difficult to ascertain what the state courts may thereafter determine the state law to be. 'In the absence of a state court ruling, our duty is tolerably clear. It is to decide, not avoid, the question.

\*　　\*　　\*　　\*　　\*　　\*

If there are no holdings from state courts, high or low, on the matter that the federal court is to decide, that court must look for other indications of the state law. [footnotes omitted] C. Wright, *Federal Courts* § 58 (3d ed. 1976).

In *Gustin v. Sun Life Assur. Co. of Canada,* 154 F.2d 961 (6th Cir. 1946) the U.S. Court of Appeals for the Sixth Circuit, citing *West v. American Telephone & Telegraph Co.,* 311 U.S. 223, 225, 61 S.Ct. 179, 85 L.Ed. 139 (1940), said that a federal court should do its best to decide the issue, considering all of the data which a state court faced with it might find persuasive. 154 F.2d at 962. Cf. *Dairy, Bakery & Food Workers v. Grand Rapids Milk Div.,* 160 F.Supp. 34, 38 (W.D.Mich.1958) (Federal Court considered Wayne County Circuit Court decision). This is why I asked the parties to brief the law of other jurisdictions which have enacted no-fault statutes.

In New York, consortium survived no-fault. In *Barker v. Scott,* 81 Misc.2d 414, 365 N.Y.S.2d 756 (1975), the court stated:

[S]uch derivative causes of action as those in negligence arising from the husband-wife and parent-child relationships are firmly grounded in law and there appears no basis whatsoever for any conclusion that by the enactment of article 18 they have been charged by implication . . . [rather] the more reasonable implication to be drawn from the omission [from the language of the act] is that they are left untouched, *except* as the new act may alter the substantive and procedural aspects of the main or source cause of action from which the [spouse's] . . . action is derived . . . 81 Misc.2d at 415–6, 365 N.Y.S.2d at 758. (emphasis in original)

I think that this reasoning is sound.

Plaintiffs also cite *Faulkner v. Allstate Insurance Co.,* 333 So.2d 488 (Fla.App.1976) which impliedly upheld the validity of the loss of consortium claim by a plaintiff when it denied the plaintiff's claim on another basis. While recognizing the remedy, the Court said the injured spouse's claim had to be denied because he had not met one of the threshold requirements of the no-fault act. On January 4, 1979, the Florida Supreme Court upheld the Appellate Court's reasoning. *Faulkner v. Allstate Insurance Co.,* 367 So.2d 214, (Fla.1979).

## CONCLUSION

For these reasons, I hold that the enactment of no-fault insurance in Michigan did not impliedly repeal the right to recover for loss of consortium. Accordingly, the Defendant's Motion is denied. An appropriate order is entered herewith.