## EIDE v KELSEY-HAYES COMPANY

Docket No. 79392. Argued November 4, 1987 (Calendar No. 7). Decided July 13, 1988. Rehearing denied *post,* 1205.

Valerie A. Eide brought an action in the Wayne Circuit Court against her employer, the Kelsey-Hayes Company, alleging employment discrimination on the basis of sex. Her husband, Craig, brought a derivative claim for loss of consortium. The court, Paul S. Teranes, J., entered judgment on a jury verdict for Valerie Eide for compensatory and exemplary damages, and for Craig Eide for loss of consortium. The Court of Appeals, BRONSON, P.J., and GRIBBS and M. E. CLEMENTS, JJ., affirmed in an opinion per curiam (Docket No. 79637). The defendant appeals.

In an opinion by Justice BOYLE, joined by Justices BRICKLEY, CAVANAGH, and ARCHER, the Supreme Court *held:*

A derivative claim for loss of consortium is not precluded under the Civil Rights Act. However, exemplary damages may not be awarded under the act apart from actual damages.

1. A claim for loss of consortium is an independent derivative cause of action and not merely an item of damages. It is a legal remedy that existed prior to the adoption of the 1963 Constitution. Because the claim is derivative, a complaining spouse must allege a violation of the act to substantiate it. Nothing in the language of the Civil Rights Act suggests a legislative intent to preclude a cause of action for loss of consortium based upon violation of the act. Nor are such actions precluded under Const 1963, art 5, § 29. The fact that the Civil Rights Act confers no civil rights upon the spouse of a person alleging violation of the act is irrelevant to whether the cause of action exists. Properly perceived, the derivative claim for loss of consortium is not a claim under the Civil Rights Act, but one at common law. The complainant does not claim to be aggrieved by an alleged violation of the act, but by the injury to the complainant's spouse.

2. The Civil Rights Act was intended as an extensive expan-

REFERENCES
Am Jur 2d, Civil Rights §§ 261, 262.
Am Jur 2d, Damages §§ 731 *et seq.*
See the Index to Annotations under Consortium; Damages; Derivative Action; Discrimination.

sion of preëxisting substantive provisions of civil rights legislation. The comprehensive nature of the act makes it qualitatively different from the predecessor statutes which were administrative schemes that focused on the employment relationship and the equitable remedies designed to address such problems. The act contains its own civil enforcement provision, allowing both legal and equitable remedies without qualification.

Affirmed in part, reversed in part, and remanded.

Justice GRIFFIN, joined by Chief Justice RILEY and Justice LEVIN, concurring in part and dissenting in part, stated that the Civil Rights Act does not provide the spouse of a person claiming employment discrimination a cause of action for loss of consortium; nor does the act provide for recovery of exemplary damages in addition to compensatory damages by a person subjected to employment discrimination.

1. The Civil Rights Act prohibits, inter alia, employment discrimination on the basis of sex. The opportunity to obtain employment without discrimination is a right conferred upon employees or applicants for employment. The conduct prohibited is that which directly affects a person with respect to employment, compensation, or a term, condition, or privilege of employment. The focus of the act is on persons who bring actions in their own right, i.e., victims of discrimination. The spouse of a person claiming employment discrimination who asserts loss of consortium is not a victim of discrimination within the meaning of the act. Absent a legislative intent to provide such a derivative cause of action, the spouse does not have a right of recovery.

2. There is no express provision in the Civil Rights Act for exemplary damages and no basis for inferring a legislative intent to provide such a remedy. In this case, the jury was erroneously instructed to award Mrs. Eide both actual and exemplary damages on the basis of mental distress.

154 Mich App 142; 397 NW2d 532 (1986) affirmed in part and reversed in part.

CIVIL RIGHTS — EMPLOYMENT DISCRIMINATION — DERIVATIVE CLAIMS
· — LOSS OF CONSORTIUM — EXEMPLARY DAMAGES.

A derivative claim for loss of consortium is not precluded under the Civil Rights Act; however, exemplary damages may not be awarded under the act apart from actual damages (MCL 37.2101 *et seq.;* MSA 3.548[101] *et seq.*).

*Susan Winshall & Associates, P.C.* (by *Susan Winshall* and *Francyne Stacey*), for the plaintiffs.

*Berry, Moorman, King, Cook & Hudson, P.C.* (by *Thomas M. Sullivan* and *Sheryl A. Laughren*), for the defendant.

Amici Curiae:

*Dickinson, Wright, Moon, Van Dusen & Freeman* (by *John Corbett O'Meara, Robert P. Young, Jr.,* and *Noel D. Massie*) for Greater Detroit Chamber of Commerce.

*Clark, Klein & Beaumont* (by *Dwight H. Vincent*); *(Christine M. Weinert* and *Francis S. Jaworski,* of counsel) for Michigan Manufacturers Association.

*Kelman, Loria, Downing, Schneider & Simpson* (by *Michael L. Pitt* and *Stuart N. Dowty*) for Michigan Trial Lawyers Association.

BOYLE, J. Two issues are presented in this review of the plaintiff's award of damages for violators of the Civil Rights Act, MCL 37.2101 *et seq.;* MSA 3.548(101) *et seq.* First, we must consider whether a derivative cause of action for loss of consortium is precluded by the Civil Rights Act. In our view, there is nothing in the statute which suggests a legislative purpose to preclude this derivative cause of action, and, indeed, to conclude otherwise would undermine the legislative purpose underlying the act. Thus, we believe, contrary to the partial dissent of Justice GRIFFIN, that a derivative claim for loss of consortium should be recognized under the Civil Rights Act.

Second, we must consider whether exemplary damages, apart from actual damages, may be awarded for violations of the Civil Rights Act. In this respect, we are in agreement with Justice GRIFFIN and conclude that exemplary damages

may not be awarded apart from actual damages. However, we would emphasize that, under long-standing Michigan law, the award of exemplary damages was duplicative of certain aspects of actual damages.

Michigan has long recognized a cause of action for loss of consortium in favor of spouses, *Montgomery v Stephan*, 359 Mich 33, 38; 101 NW2d 227 (1960). But see *Sizemore v Smock*, 430 Mich 283, 299; 422 NW2d 666 (1988) (concurring opinion of Justice GRIFFIN suggesting that *Berger v Weber*, 411 Mich 1; 303 NW2d 424 [1981], is no longer to be regarded as precedent). A claim for loss of consortium is simply one for loss of society and companionship. As Justice GRIFFIN explains, a claim for loss of consortium is usually considered to be derivative, but only in the sense that it does not arise at all unless the other, impaired spouse has sustained some legally cognizable harm or injury. Thus, courts have consistently treated loss of consortium not as an item of damages, but as a separate cause of action. *Montgomery, supra.* See also Prosser & Keeton, Torts (5th ed), § 125, pp 931-934. This fact is often obscured by the use of the term "derivative" and also by the common procedural requirement that the claim be joined with that of the impaired spouse. As one commentator has explained:

> So far as damages are based on intangible losses of society and affection, there is some risk that a jury hearing the husband's claim will consciously or not, include something in the verdict for the wife's loss as well, and vice versa. To minimize this risk, some courts have required that the main claim and the consortium claim be tried together, at least in the ordinary situation. [Prosser & Keeton, *supra,* p 933. See also *Rusinek v Schultz, Snyder & Steele Lumber Co,* 411 Mich 502, 508; 309 NW2d 163 (1981).]

In our view, the partial dissent of Justice GRIF-
FIN obscures the fact that loss of consortium is a
separate cause of action and thus misstates the
issue presented in this case. The question is not
whether a cause of action is available under the
Civil Rights Act, but whether there is anything in
the act which would preclude this independent
cause of action. We believe that this question must
be answered in the negative.

In *Boscaglia v Michigan Bell Telephone Co,* 420
Mich 308; 362 NW2d 642 (1984), we considered a
distinctly different question—whether Michigan's
Fair Employment Practices Act, 1955 PA 251,
authorized a claim for loss of consortium. In doing
so, we principally relied upon the remedial lan-
guage of the FEPA and its focus on equitable relief.
*Boscaglia, supra* at 322. That language specified:

> If, upon the preponderance of the evidence on
> the record considered as a whole, the [fair employ-
> ment practices] commission shall determine that
> the respondent has engaged in or is engaging in
> any unfair employment practice, the commission
> shall state its findings of fact and shall issue and
> cause to be served on such respondent an order
> requiring such respondent to cease and desist from
> such unfair employment practice and to take such
> further affirmative or other action as will effectu-
> ate the purposes of this act, including, but not
> limited to, hiring, reinstatement or upgrading of
> employees with or without back pay, or admission
> or restoration to union membership, including a
> requirement for reports of the manner of compli-
> ance. [1955 PA 251, § 7(h).]

In addition, the *Boscaglia* Court noted that title VII
of the federal Civil Rights Act of 1964, 42 USC
2000e-5(g), was similarly limited to equitable reme-
dies and had been construed to preclude a cause of

action for loss of consortium. *Boscaglia, supra* at 323.

The Civil Rights Act, 1976 PA 453, which supplanted the FEPA, is not limited to remedying discrimination in employment, but extends to public accommodations, services, and educational institutions. In language befitting this comprehensive scheme, art 8 of the Civil Rights Act includes its own civil action enforcement provision:

> A person alleging a violation of this act may bring a civil action for appropriate injunctive relief or damages, or both. [MCL 37.2801(1); MSA 3.548(801)(1).]

Nothing in the language of this provision suggests a legislative intent to preclude a cause of action for loss of consortium. Indeed, elsewhere in art 8 of the act it is emphasized:

> This act shall not be construed to diminish the right of a person to direct or immediate legal or equitable remedies in the courts of this state. [MCL 37.2803; MSA 3.548(803)(1).]

The interpretive provision of § 803 of the Civil Rights Act mirrors the interpretive provision of Const 1963, art 5, § 29:

> Nothing contained in this section shall be construed to diminish the right of any party to direct and immediate legal or equitable remedies in the courts of this state.[1]

---

[1] Const 1963, art 5, § 29 provides in full:

There is hereby established a civil rights commission which shall consist of eight persons, not more than four of whom shall be members of the same political party, who shall be appointed by the governor, by and with the advice and consent of the senate, for four-year terms not more than two of which shall

It is therefore apparent that the legislative purpose underlying the civil enforcement provision of the Civil Rights Act was intended to provide all rights embraced in Const 1963, art 5, § 29.[2] More-

expire in the same year. It shall be the duty of the commission in a manner which may be prescribed by law to investigate alleged discrimination against any person because of religion, race, color or national origin in the enjoyment of the civil rights guaranteed by law and by this constitution, and to secure the equal protection of such civil rights without such discrimination. The legislature shall provide an annual appropriation for the effective operation of the commission.

The commission shall have power, in accordance with the provisions of this constitution and of general laws governing administrative agencies, to promulgate rules and regulations for its own procedures, to hold hearings, administer oaths, through court authorization to require the attendance of witnesses and the submission of records, to take testimony, and to issue appropriate orders. The commission shall have other powers provided by law to carry out its purposes. Nothing contained in this section shall be construed to diminish the right of any party to direct and immediate legal or equitable remedies in the courts of this state.

Appeals from final orders of the commission, including cease and desist orders and refusals to issue complaints, shall be tried de novo before the circuit court having jurisdiction provided by law.

[2] Further indication that the interpretive language of Const 1963, art 5, § 29 was intended to preclude this article from restricting any known legal or equitable remedies can be gleaned from the debate on the Garvin Amendment which would have given the Civil Rights Commission exclusive jurisdiction during the processing of complaints before the commission. The Garvin Amendment ultimately failed, but in support of it, Delegate William Ford remarked:

What is happening here, when we look at it in the first instance, is that we are creating an administrative body which we hope will have the general characteristics of an administrative body and that when the legislature defines its powers, the legislature is going to be directed to do certain things, but is not going to be restricted any more than necessary. It is possible to construe this language to be a restriction on the legislature never to ever give to this administrative body original jurisdiction over any matter involving civil rights in the first instance.

*There isn't anyone, I am sure, including Mr. Garvin, who would advocate an administrative remedy to the exclusion of your rights in the court,* but the whole principle of administrative law is that you have a specialized tribunal that deals with

over, it is apparent that Const 1963, art 5, § 29 itself cannot be construed to limit the legal and equitable remedies of the Michigan citizen. A right of action for loss of consortium is not only an existing legal remedy, but one which was in existence long before the adoption of Const 1963. *Montgomery, supra.*

Nothing in the language of the statute itself warrants such a restrictive interpretation. The partial dissent has fixed upon the opening clause of § 801(1), which provides: "A person alleging a violation of this act . . . ." The partial dissent asserts that a spouse in an action for loss of consortium is not such a person. This is obviously incorrect. However, it is undisputed that loss of consortium is a *derivative* cause of action and the complaining spouse must allege a violation of the act to substantiate the claim. Thus, the clear language of the statute would support recognition of a cause of action for loss of consortium. *Hiltz v Phil's Quality Market,* 417 Mich 335, 343; 337 NW2d 237 (1983). Moreover, the fact that the act itself does not confer civil rights upon the spouse is entirely irrelevant to whether an independent cause of action exists for loss of consortium.[3] Properly perceived, Craig Eide's claim for loss of con-

special subject matter and has people especially trained to deal with that subject matter, and because they are dealing only with a certain limited area, have day to day actual knowledge of the conditions that exist. [2 Official Record, Constitutional Convention 1961, p 2192.]

[3] Contrary to the assertion of the partial dissent, the Civil Rights Act does not confer civil rights only upon employees and applicants for employment. The act also creates a cause of action for discrimination in public accommodations, MCL 37.2301 *et seq.;* MSA 3.548(301) *et seq.,* education, MCL 37.2401 *et seq.;* MSA 3.548(401) *et seq.,* and in housing, MCL 37.2501 *et seq.;* MSA 3.548(501) *et seq.* Furthermore, it is misleading to suggest that civil rights of employees and job applicants are "created" by the Civil Rights Act since, in my view, these rights are created in the United States or Michigan Constitutions, and the act merely creates certain remedies for their violation.

sortium is not a claim under the Civil Rights Act, but a claim at common law. Prosser & Keeton, *supra.*

Assuming that any construction of § 801(1) of the act is necessary, it must first be compared with the correlative language of its statutory predecessor, the FEPA. The opening clause of the FEPA, § 7(b) was: "Any individual claiming to be aggrieved by an alleged unlawful employment practice . . . ." As we emphasized in *Boscaglia,* the complainant in a derivative cause of action, such as loss of consortium, does not claim to be aggrieved by an alleged unlawful employment practice, but by the subsequent injury to the impaired spouse. *Boscaglia, supra* at 322. In contrast, the opening clause of the civil enforcement provision of the Civil Rights Act is: "A person alleging a violation of this act . . . ." It is presumed that a change of language in a statute is intended to change the result of the statute. 2A Sands, Sutherland Statutory Construction (4th ed), § 45.12, pp 54-55. We would, therefore, construe this broadening of the statutory language to imply a broadening of the remedy to which it is addressed. Such a construction is also consistent with the well-established rule that remedial statutes are to be liberally construed to suppress the evil and advance the remedy. 3 Sands, Sutherland Statutory Construction (4th ed), § 60.01, p 55. Therefore, in our view, neither the clear language of the act nor conventional rules of statutory construction support the partial dissent's view that § 801(1) precludes a claim for loss of consortium.[4]

---

[4] Although the partial dissent quotes the House Legislative Analysis, Second Analysis, HB 4055, December 30, 1976 (as enrolled), it does so selectively. The full text of the analysis of the civil action provision explains:

We have addressed the intrinsic analysis of the partial dissent because we believe that it is ultimately flawed. However, we cannot embrace the partial dissent's implicit assumption that resolution of this question may be found in the letter of the statute. As this Court has previously explained:

> The Civil Rights Act did not merely codify preëxisting statutes and procedural remedies. It worked an extensive expansion of the preëxisting substantive provisions of civil rights legislation. [*Matras v Amoco Oil Co*, 424 Mich 675, 696-697; 385 NW2d 586 (1986).][5]

In our view, the comprehensive nature of the Civil Rights Act makes it qualitatively different from any predecessor statute, such as the FEPA, and far greater than the sum of these "parts." The FEPA remedies provision was modeled after the federal Fair Employment Practices Act, *Boscaglia, supra* at 323, which was in turn modeled after the Labor-Management Relations Act, 29 USC 160. *Albemarle Paper Co v Moody*, 422 US 405, 417-419; 95 S Ct 2362; 45 L Ed 2d 280 (1975). All are essentially administrative schemes that focus upon the *employment* relationship, and the equitable remedies provided therein were designed to address

---

The bill would allow a person alleging a violation of this Act to bring a civil action in the circuit court for injunctive relief, damages, or both. *The Act could not be construed to diminish the right of a person to legal or equitable remedies in Michigan courts.* [Emphasis added.]

[5] We are not persuaded by the partial dissent's suggestion, contrary to *Matras*, that the Civil Rights Act merely codified existing rights. Read in its full context, Department of Labor Analysis, HB 4055, April 5, 1976, provides scant support for the general statement that the purpose of the bill was merely to codify remedies. In any case, the Department of Labor's unique vantage suggests a rather limited analysis of the act, consistent with the scope of that department's interests. See opinion of Justice GRIFFIN, *post,* p 46, n 10.

problems in that relationship. See 1955 PA 251, § 7(h). The Civil Rights Act is much broader in scope.[6] To focus upon any particular language of the statute, much less a flawed reading of that language, is to ignore the manifest breadth and comprehensive nature of this remedial statute.

This Court was acutely aware of the limitations of the FEPA when it fashioned a judicially created, private remedy for racial discrimination in employment. *Pompey v General Motors Corp,* 385 Mich 537; 189 NW2d 243 (1971). Our restraint in further extending this judicially created remedy under *Boscaglia* was heavily influenced, if not solely dependent upon, the limitations of the FEPA remedy.[7] No such limitation is presented under the Civil Rights Act. Indeed, the Court of Appeals and federal courts have consistently extended the remedies provided under the Civil Rights Act to damages for humiliation, embarrassment, and outrage. See, e.g., *Schafke v Chrysler Corp,* 147 Mich App 751, 754; 383 NW2d 141 (1985), lv den 424 Mich 892 (1986); *Slayton v Michigan Host, Inc,* 122 Mich App 411, 416-417; 332 NW2d 498 (1983); *Freeman v Kelvinator, Inc,* 469 F Supp 999, 1004 (ED Mich, 1979).

Finally, we believe that the partial dissent is flawed in its continuing reliance upon federal precedent under title VII of the Civil Rights Act of 1964, 42 USC 2000e-5(g). While we have previously noted the refusal of federal courts to recognize claims for loss of consortium under title VII, *Boscaglia, supra,* we have not based our interpretation

---

[6] See n 3.

[7] The New York decision cited in *Boscaglia, Hart v Sullivan,* 84 AD2d 865, 866; 445 NYS2d 40 (1981), aff'd 55 NY2d 1011; 449 NYS2d 481; 434 NE2d 717 (1982), was based upon New York statutes which, like the FEPA, have very limited remedy provisions. See NY, Civil Rights Law, § 40-c, 40-d (McKinney). See also NY, Executive Law, § 297(9) (McKinney).

of Michigan law upon them. Again, it must be emphasized that a claim for loss of consortium is an *independent* cause of action and not merely an item of damages. That claims for loss of consortium are not properly brought under title VII is apparent from the language of its remedies provision:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. [42 USC 2000e-5(g).]

The title VII remedies provision does not merely omit loss of consortium, but actually limits the claimant to equitable relief.[8] In contrast, loss of consortium is a legal remedy and therefore unavailable under title VII. *Hooten v Pennsylvania College of Optometry,* 601 F Supp 1151, 1155, n 2 (ED Pa, 1984); *Pryor v United States Gypsum,* 585 F Supp 311, 317 (WD Mo, 1984). Furthermore, although title VII does not preclude an independent action under state law or other federal statutes, *Johnson v Railway Express Agency,* 421 US 454, 459; 95 S Ct 1716; 44 L Ed 2d 295 (1975), the extremely limited scope of federal common law following *Erie R Co v Tomkins,* 304 US 64, 78; 58 S Ct 817; 82 L Ed 1188 (1937), does not extend to

[8] As one federal court has explained, the back pay authorized under title VII is properly understood as restitution and not damages. *Torres v Claytor,* 25 FEP Cases 998, 1000 (SD Cal, 1978).

title VII. *Northwest Airlines, Inc v Transport Workers Union, AFL-CIO,* 451 US 77; 101 S Ct 1571; 67 L Ed 2d 750 (1981).[9] See, generally, 19 Wright, Miller & Cooper, Federal Practice and Procedure, § 4514 *et seq.,* pp 217 ff. Indeed, it is doubtful that even a pendent state claim for loss of consortium could be maintained in a title VII action because of stringent jurisdictional limitations over pendent parties. *Fritts v Niehouse,* 604 F Supp 823 (WD Mo, 1984).

Michigan law is not bound by these statutory and jurisdictional restraints. The Michigan Civil Rights Act now contains its own civil enforcement provision, allowing both legal and equitable remedies without qualification. Michigan common law is not limited by the *Erie* doctrine and has in fact long recognized the right of each spouse to an independent action for loss of consortium. *Boscaglia* simply provides no authority in this case. As explained by Justice SMITH in *Montgomery, supra* at 38, "Our oath is to do justice, not to perpetuate error." Finding no other principled basis either within or without the opinion of the partial dissent for this restriction of the civil rights of Michigan citizens, we conclude that Craig Eide has properly stated a claim for loss of consortium under Michigan law.

As we have previously noted, we agree with the conclusion of the partial dissent that the award of exemplary damage to Mrs. Eide was in error. The judgment of the circuit court is, therefore, affirmed in part and reversed in part. This matter is remanded to the circuit court for entry of judgment in accordance with this opinion.

---

[9] It is interesting to note that when federal common law *is* available, the United States Supreme Court has recognized a cause of action for loss of consortium. See *American Export Lines, Inc v Alvez,* 446 US 274; 100 S Ct 1673; 64 L Ed 2d 284 (1980) (recognizing a cause of action for loss of consortium under general federal maritime law).

BRICKLEY, CAVANAGH, and ARCHER, JJ., concurred with BOYLE, J.

GRIFFIN, J. (*concurring in part and dissenting in part*). We granted leave to appeal in this case to decide whether the Civil Rights Act[1] provides the spouse of a person subjected to discrimination with a remedy for loss of consortium, and to decide whether that act allows recovery of exemplary damages.[2] We would answer both questions in the negative.

I

Plaintiff Valerie Eide was employed as an inspector in the Milford, Michigan, plant of the defendant, Kelsey-Hayes Company, from January, 1972, until April 10, 1980, when she walked out of the plant. Thereafter, she and her husband, Craig Eide, filed this employment discrimination suit, alleging that she had been sexually harassed during the course of her employment in violation of the Civil Rights Act. The amended complaint alleged that Mrs. Eide suffered severe physical and mental injuries as well as economic losses as a result of sexual harassment.[3]

---

[1] 1976 PA 453, as amended by 1977 PA 162, 1979 PA 91, and 1982 PA 45, MCL 37.2101 *et seq.;* MSA 3.548(101) *et seq.*

[2] This Court's order granting leave to appeal specifically limited our review to the following issues:

(1) whether the Civil Rights Act provides a remedy based on loss of consortium, and (2) whether the Civil Rights Act allows recovery of exemplary damages. [428 Mich 873 (1987).]

[3] The Civil Rights Act provides that an employer shall not:

Fail or refuse to hire, or recruit, or discharge, or otherwise discriminate against an individual with respect to employment,

In the same complaint, Mr. Eide set forth a derivative claim alleging that

> [a]s a direct and proximate result of Defendant's unlawful employment practices causing the resulting injuries to Plaintiff, Valerie A. Eide, her husband, Plaintiff, Craig A. Eide, has suffered a loss of consortium since the beginning of the sexual harassment and discriminatory practices against his wife . . . .

At trial, over objection by defendant, the court instructed the jury regarding the availability to Mr. Eide of damages for loss of consortium.[4] The court also instructed the jury on the availability to Mrs. Eide of both (1) compensatory damages for "mental anguish, fright and shock, . . . embarrassment, humiliation or mortification . . . the increase in her physical and emotional distress . . ." and (2) exemplary damages for "added injury to her feelings" resulting from alleged egregious conduct on the part of the defendant.

The jury awarded Mrs. Eide $240,000 in compen-

---

> compensation or a term, condition, or privilege of employment, because of . . . sex . . . . [MCL 37.2202(1)(a); MSA 3.548(202)(1)(a).]

The act further provides:

> Discrimination because of sex includes sexual harassment which means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature when:

> * * *

> (iii) Such conduct or communication has the purpose or effect of substantially interfering with an individual's employment . . . or creating an intimidating, hostile, or offensive employment . . . environment. [MCL 37.2103(h); MSA 3.548(103)(h).]

[4] For a definition of "consortium," see *Montgomery v Stephan,* 359 Mich 33, 35-36; 101 NW2d 227 (1960).

satory damages and $32,000 in exemplary damages. Mr. Eide was awarded $28,000 for loss of consortium. Thereafter, the trial court's judgment on the verdict was affirmed by the Court of Appeals. 154 Mich App 142; 397 NW2d 532 (1986).

## II

We first address the issue whether a cause of action for loss of consortium is available under the Civil Rights Act to the spouse of a person subjected to discrimination.

A similar question was before this Court in *Boscaglia v Michigan Bell Telephone Co,* 420 Mich 308; 362 NW2d 642 (1984). In that case, an employee complained of employment discrimination in violation of the Fair Employment Practices Act (FEPA),[5] and his wife joined in the action seeking damages for loss of consortium. This Court determined that although the FEPA made available, for the first time, a remedy to an employee claiming employment discrimination, "[t]he statute did not . . . provide a remedy to the employee's spouse for loss of consortium or injury to the marital relationship." *Id.,* p 322.

Undergirding the Court's reasoning in *Boscaglia* was recognition that

> "prior to the passing of [the FEPA] in 1955, there was in Michigan no recognized legal remedy for acts of discrimination . . . in private employment." *Pompey v General Motors Corp,* [385 Mich 537, 552; 189 NW2d 243 (1971)]. The common law did not provide a remedy either to an employee who claimed to be a victim of employment discrimination or to an employee's spouse who claimed to have suffered injury to the marital relationship as

---

[5] 1955 PA 251, MCL 423.301 *et seq.;* MSA 17.458(1) *et seq.*

a result of the discrimination against the employee. [*Boscaglia, supra,* p 321.][6]

This Court observed that

"the question whether a statute creates a private right of action is ultimately 'one of [legislative] intent, not one of whether this Court thinks that it can improve upon the statutory scheme that [the Legislature] enacted into law . . . .' " [*Universities Research Ass'n, Inc v Coutu,* 450 US 754, 770; 101 S Ct 1451; 67 L Ed 2d 662 (1981) (quoting *Touche Ross & Co v Redington,* 442 US 560, 578; 99 S Ct 2479; 61 L Ed 2d 82 [1979]). *Boscaglia, supra,* pp 317-318.]

After examining the language and history of the FEPA, the unanimous *Boscaglia* Court concluded that the FEPA did not provide a derivative cause of action for an employee's spouse.[7] The Court said:

---

[6] In *St John v General Motors Corp,* 308 Mich 333; 13 NW2d 840 (1944), this Court did allow recovery of damages in a civil action on the basis of a violation of a penal statute which prohibited discrimination as between the sexes in the payment of wages.

[7] Declining to expand the common law to create a parent's action in tort for loss of a child's society and companionship, this Court, in an opinion by Chief Justice RILEY, recently said:

The consortium action is somewhat of an anomaly in the law of tort in that it is generally the rule that a negligent tortfeasor's liability only extends to an obligation to compensate the person directly injured. Although it is eminently foreseeable that a negligent injury to one party will result in adverse consequences that affect others to one degree or another, the law cannot redress every injury, and the determination of where to draw the line of liability is essentially a question of policy.

\* \* \*

Foreseeability of injury alone does not mandate recognition of a cause of action. Social policy must intervene at some point to limit the extent of one's liability.

\* \* \*

[T]he determination of whether this state should further extend a negligent tortfeasor's liability for consortium damages

The question once again is one of legislative
intent. Absent a legislative intent to provide such
a derivative cause of action, the spouse of a person
subjected to discrimination does not have a right
of recovery. [*Id.,* p 324.]

This Court's holding in *Boscaglia* was limited to
the provisions of the FEPA, and we expressly re-
served judgment as to whether an employee's
spouse might maintain an action for loss of consor-
tium under the Civil Rights Act. *Id.,* p 324, n 23.
Accordingly, we look now to the language and
history of the Civil Rights Act to see how it differs
from the FEPA.

Enacted by the Michigan Legislature in 1976,
the Civil Rights Act prohibits discrimination on
the basis of sex, race, national origin, religion,
height, weight, or marital status in employment,
housing, use of public accommodations, public ser-
vice, and educational facilities. Broader in scope, it
repealed and replaced the FEPA, which was limited
in its application to discrimination in private em-
ployment.[8]

In reaching the conclusion that an employee's
spouse could not maintain an action under the
FEPA for loss of consortium, the *Boscaglia* Court
focused on the remedies section of the FEPA which
in relevant part provided:

> *Any individual claiming to be aggrieved* by an
> alleged unlawful employment practice may
> . . . make, sign and file with the board . . . a ver-
> ified complaint in writing . . . . [MCL 423.307(b);

should be deferred to legislative action rather than being
resolved by judicial fiat. [*Sizemore v Smock,* 430 Mich 283, 292-
293, 299; 422 NW2d 666 (1988).]

[8] In 1965, the FEPA was amended to prohibit discrimination in
employment on account of age, 1965 PA 344, and, in 1966, to prohibit
discrimination on account of sex, 1966 PA 349.

MSA 17.458(7)(b). Emphasis supplied.]

This Court held that an employee's spouse was not a person "aggrieved" within the meaning of the statute. *Boscaglia, supra,* p 322.

Corresponding language in the remedies section of the Civil Rights Act provides:

> *A person alleging a violation of this act* may bring a civil action for appropriate injunctive relief or damages, or both. [MCL 37.2801(1); MSA 3.548(801)(1). Emphasis supplied.]

As this Court has said, "[s]tatutory analysis necessarily begins with the wording of the statute itself." *Carr v General Motors Corp,* 425 Mich 313, 317; 389 NW2d 686 (1986). The phrase "a violation of this act" plainly refers to a violation of an individual's civil rights as defined in the Civil Rights Act. Insofar as employment discrimination is concerned, the act makes clear that

> [t]he opportunity to obtain employment . . . without discrimination because of religion, race, color, national origin, age, *sex,* height, weight, or marital status as prohibited by this act, is recognized and *declared to be a civil right.*[9] [MCL 37.2102(1); MSA 3.548(102)(1). Emphasis supplied.]

As we read the act, this civil right is conferred upon two groups of individuals: (1) employees, and (2) applicants for employment:

> (1) An employer shall not:
> (a) Fail or refuse to hire, or recruit, or discharge,

[9] By definition the term "discrimination because of sex" includes sexual harassment. See n 3.

or otherwise discriminate against *an individual with respect to employment, compensation, or a term, condition, or privilege of employment,* because of religion, race, color, national origin, age, sex, height, weight, or marital status.

(b) Limit, segregate, or classify *an employee or applicant for employment* in a way which deprives or tends to deprive *employee or applicant* of an employment opportunity, or otherwise adversely affects the status of an *employee or applicant* because of religion, race, color, national origin, age, sex, height, weight, or marital status.

(c) Segregate, classify, or otherwise discriminate against *a person* on the basis of sex *with respect to a term, condition, or privilege of employment, including a benefit plan or system.* [MCL 37.2202; MSA 3.548(202). Emphasis supplied.]

Significantly, the only conduct addressed by this controlling portion of the act is conduct "with respect to employment, compensation, or a term, condition, or privilege of employment," which directly affects employees or applicants for employment. This Court has stated that "[w]here a statute creates and regulates, . . . and names the parties granted [the] right to invoke its provisions . . . , such parties only may act." *Taylor v Public Utilities Comm,* 217 Mich 400, 403; 186 NW 485 (1922).

Further, our review of the legislative history of the Civil Rights Act indicates that there were two principal purposes behind its enactment, neither of which lends support to plaintiffs' contention that the Legislature intended to create a new derivative cause of action for the spouse of an employee who complains of employment discrimination. First, the history makes plain that it was the Legislature's purpose to "*codify* protection against discrimination in the areas of employment,

housing, education and public accommodations."[10] (Emphasis supplied.) Prior to enactment of the Civil Rights Act, there were four separate statutes which dealt with civil rights protection in the several areas mentioned.

The codification purpose was served by a change in the wording of the remedies section from the phrase "[a]ny individual claiming to be aggrieved *by an alleged unlawful employment practice"* (emphasis supplied) in the FEPA to "[a] person alleging a violation of this act" in the Civil Rights Act. Thus, the remedies section of the act was not limited to employment discrimination actions. We do not read this change as creating a new cause of action for Mr. Eide. The act requires that the person filing a complaint must be the "person alleging a violation of this act." MCL 37.2801(1); MSA 3.548(801)(1). There is no indication in the act that a person alleging a violation of the act

_____

[10] Department of Labor Analysis, HB 4055, April 5, 1976:

1. What is the purpose of the bill?
The *purpose of the bill is to codify* protection against discrimination in the areas of employment, housing, education and public accommodations.

\* \* \*

6. What are the arguments for and against the bill?
*The bill would pull together the separate public acts* that the Department of Civil Rights is currently operating under into one comprehensive act *for administrative and management purposes.*
The bill would clarify and coördinate remedies for proven violations.
The bill would provide consistent jurisdictional coverages. Currently different categories have either partial or total protection within the four areas of employment, housing, education and public accommodations. The proposed legislation would provide for uniform jurisdiction for all categories. [Emphasis supplied.]

See also Department of Education Analysis, HB 4055, February 18, 1975, and Department of Labor Analysis, HB 4055, January 21, 1976.

might be anyone other than a person whose rights have been violated.

Mr. Eide does not claim that he is the victim of discrimination. His civil rights were not violated, and, since he makes no such claim, we conclude that he is not "a person alleging a violation" within the meaning of the Civil Rights Act.

A second purpose behind the Civil Rights Act, as revealed by its legislative history, was to provide by statute for an alternate, equal forum in the circuit courts for individuals otherwise entitled to file a complaint with the Civil Rights Commission.[11] Contrary to the position urged by plaintiffs, the legislative history reflects no intention on the part of the Legislature to expand the class of protected persons. An analysis provided by the House Legislative Analysis Section explained the purpose of the "direct access" provision:

> The bill would also outline more specifically the legal action a person could take *if that person feels that he or she has been unfairly discriminated against,* and would provide stricter penalties for violation of the Act. [House Legislative Analysis, First Analysis, HB 4055, April 9, 1976, p 1; House Legislative Analysis, Second Analysis, HB 4055 (as enrolled), December 30, 1976, p 1. Emphasis added.]

Obviously, the focus of the act plainly rests on persons who bring discrimination actions in their own right.

It is argued on behalf of plaintiffs that a statutory basis is not required to bring a derivative action for loss of consortium because this claim

---

[11] The provision of direct access to the courts for a civil rights violation could also be viewed as codification since this Court had already recognized the right of direct access as a cumulative judicial remedy for an employer's violation of the FEPA. See *Pompey v General Motors,* 385 Mich 537; 189 NW2d 243 (1971).

existed at common law and continues to be available unless abrogated by the constitution or statute.

However, plaintiffs rely on cases where the action for loss of consortium was derivative to recognized common-law claims. As discussed in *Pompey v General Motors Corp, supra,* 385 Mich 552, prior to the enactment of the FEPA, employment discrimination was not a recognized common-law tort in Michigan.[12] The common law did not provide a remedy either to an employee who claimed to be a victim of discrimination or to an employee's spouse for loss of consortium as a result of the discrimination. *Boscaglia v Michigan Bell, supra,* 420 Mich 321.

We therefore find inapposite plaintiffs' citation of *Rusinek v Schultz, Snyder & Steele Lumber Co,* 411 Mich 502, 507; 309 NW2d 163 (1981), for the proposition that "statutes which abolish the common law should be construed narrowly." *Rusinek* involved the recovery of damages for personal injuries and loss of consortium as a result of an automobile accident. Such actions were recognized under Michigan tort law prior to the enactment of the no-fault statute. Cf. *Cotton v Minter,* 469 F Supp 199 (ED Mich, 1979); *Warner v Brigham,* 90 Mich App 640; 282 NW2d 428 (1979) (involving claims under the no-fault statute). Here, by recognizing only those actions allowed under the Civil Rights Act, this Court would not abolish any loss of consortium claim as it existed at common law.[13]

---

[12] There were early civil rights penal statutes which were interpreted to allow a cumulative civil rights action for an individual who suffered discrimination. See *Pompey, supra,* 385 Mich 556.

[13] The Kansas Court of Appeals has taken the same approach we do here: In *Albertson v Travis,* 2 Kan App 2d 153; 576 P2d 1090 (1978), the court held that since there was no common-law claim for loss of

While it is true that a derivative[14] claim for loss
of consortium has been recognized in connection
with various other common-law causes of action,
*Montgomery v Stephan,* 359 Mich 33, 49; 101
NW2d 227 (1960), we do not regard that to be a
basis for judicial expansion of the terms of the
Civil Rights Act, which is wholly a creature of the
Legislature. Such expansion would ignore the rea-
soning of *Boscaglia* and its holding that

> [a]bsent a legislative intent to provide such a
> derivative cause of action, the spouse of a person
> subjected to discrimination does not have a right
> of recovery. [*Boscaglia, supra,* p 324.]

Having declined in *Boscaglia* to go beyond the
terms of the FEPA, we would take the same ap-
proach with respect to the Civil Rights Act.[15]

Accordingly, we conclude that the Civil Rights

consortium and one was not created by the applicable state statute,
the consortium action could not be recognized.

For other court decisions which have not allowed derivative loss of
consortium claims in discrimination actions, see: *Hart v Sullivan,* 84
AD2d 865; 445 NYS2d 40 (1981), aff'd 55 NY2d 1011; 449 NYS2d 481;
434 NE2d 717 (1982); *Long v American Int'l Adjustment Co,* 40 EPD
¶ 36,289 (D Mass, 1986).

[14] Although Michigan has treated loss of consortium claims as
derivative, *Rusinek, supra,* other jurisdictions have taken the view
that loss of consortium is an independent right belonging solely to the
injured spouse. See Dickson, *Loss of consortium: An independent or
derivative cause of action?,* 22 Trial 53 (Aug, 1986). 2 Speiser, Krause
& Gans, The American Law of Torts, Damages, § 8:22, pp 581-582,
discusses the view that the claim is derivative:

> A claim of a deprived spouse for loss of consortium is usually
> considered to be derivative—but only in the sense that it does
> not arise at all unless the other—the impaired spouse—has
> sustained some kind of harm or injury that is legally compensa-
> ble and is a valid main claim.

[15] In interpreting title VII of the federal Civil Rights Act, 42 USC
2000e-5(g), many federal courts have held that an employee's spouse
is not entitled to recover for loss of consortium. As the federal district
court said in *United States v Biloxi Municipal School Dist,* 219 F
Supp 691, 694 (SD Miss, 1963), aff'd 326 F2d 237 (CA 5, 1964), "[o]nly

Act does not provide a remedy on the basis of loss
of consortium for the spouse of an individual who
claims to be the subject of discrimination.[16]

III

Next, we turn to the question whether exem-
plary damages were properly awarded to Mrs.
Eide. As already noted, in addition to $240,000 in
compensatory damages, the jury's verdict included
an award to Mrs. Eide of $32,000 in exemplary
damages.[17]

---

persons actually deprived of their individual civil rights can redress
such rights." See also *Torres v Claytor,* 25 FEP Cases 998 (SD Cal,
1978); *Asklar v Honeywell, Inc,* 95 FRD 419; 29 FEP Cases 1596 (D
Conn, 1982). We recognize, however, that the title VII remedy has
been construed by a number of courts as equitable in nature only.

[16] In view of our holding, it is unnecessary to address the claim of
amicus curiae that Mr. Eide lacks standing to sue under the act.

[17] The trial court instructed the jury regarding actual or compensa-
tory damages, including damages for "mental anguish," as follows:

If you decide that the plaintiff, Valerie Eide is entitled to
damages . . . .

include each of the following elements of damages which you
decide has been sustained by the plaintiff to the present time.
Physical pain and suffering, *mental anguish, fright and shock,*
denial of social pleasure and enjoyment, *embarrassment, humil-
iation or mortification . . . the increase in her physical and
emotional distress . . . .* You should also include each of the
following elements of damages which you decide plaintiff Val-
erie Eide is reasonably certain to sustain in the future:

Physical pain and suffering, *mental anguish,* denial of social
pleasure and enjoyment, *embarrassment, humiliation or morti-
fication, the increase in her physical and emotional
distress . . . .* [Emphasis supplied.]

Concerning exemplary damages, the court instructed the jury:

If you find that the conduct of the defendant Kelsey-Hayes
Company was malicious and reckless [sic] disregard of Mrs.
Eide's rights, then you may award exemplary damages. *Such
damages represent the amount by which you may increase or
augment any award of compensatory damages to Mrs. Eide.*
Amount of such damages if you find them, may be determined

In the early Michigan decisions, there was authority for assessing exemplary or punitive damages in a civil proceeding for the purpose of punishing a defendant for egregious conduct. However, in 1884 Justice COOLEY wrote two opinions which sharply altered the course of Michigan jurisprudence in this area.[18] Since then, Michigan has been among a minority of jurisdictions which adhere to the rule that exemplary damages may not be awarded to punish. They are available, if at all, only as an element of compensatory damages.

In *Stilson v Gibbs,* 53 Mich 280, 284; 18 NW 815 (1884), Justice COOLEY wrote:

> [I]t is manifestly proper that the jury should estimate the damages with the aggravating circumstances in mind, and that they should endeavor fairly to compensate the plaintiff for the wrong he has suffered. But in all cases it is to be distinctly borne in mind that *compensation to the plaintiff is the purpose in view,* and any instruction which is calculated to lead them to suppose that besides compensating the plaintiff they may punish the defendant is erroneous. [Emphasis supplied.]

The continuing viability of this principle was recognized in *Kewin v Massachusetts Mutual Ins Co,* 409 Mich 401, 419; 295 NW2d 50 (1980):

> In Michigan, exemplary damages are recoverable as *compensation* to the plaintiff, *not as punishment* of the defendant. [Citations omitted.] Our

---

in accordance with the degree of wantonness or recklessness in the defendant's misconduct or in accordance with the defendant's motivation and/or to compensate the plaintiff for the *added injury to her feelings* as a result from egregious conduct of the defendant. [Emphasis supplied.]

[18] *Stilson v Gibbs,* 53 Mich 280; 18 NW 815 (1884), and *Watson v Watson,* 53 Mich 168; 18 NW 605 (1884).

review of the precedent indicates that those cases which permit recovery of exemplary damages as an element of damages involve tortious conduct on the part of the defendant. [Citations omitted.] An award of exemplary damages is considered proper if it compensates a plaintiff for the "humiliation, sense of outrage, and indignity" resulting from injuries "maliciously, wilfully and wantonly" inflicted by the defendant. *McFadden* [*v Tate,* 350 Mich 84, 89; 85 NW2d 181 (1957)]. The theory of these cases is that the reprehensibility of the defendant's conduct both intensifies the injury and justifies the award of exemplary damages as compensation for the harm done the plaintiff's feelings. [Emphasis supplied.][19]

However, in 1982, this Court ruled that exemplary damages for mental distress are not separately recoverable as "exemplary" damages where a plaintiff is fully compensated for mental distress through the award of actual or "compensatory" damages. In *Veselenak v Smith,* 414 Mich 567, 573-574; 327 NW2d 261 (1982), this Court concluded that an earlier justification for separately awarding exemplary damages for mental distress no longer exists:

A close reading of the early exemplary damages cases also suggests that these unusual damages may have been used to supply a remedy for mental injury not otherwise recognized. Actual damages compensated for economic loss, but not for non-economic loss. In addition, the award of actual damages seemed to preclude the award of additional compensation for non-economic loss. *Warren*

---

[19] The rule in Michigan that exemplary damages must be an element of compensation, not punishment, has been criticized. See, e.g., Shecter, *Exemplary damages—A new exemplar,* 60 Mich B J 654 (1981), 2 Speiser, Krause & Gans, The American Law of Torts, § 8:45, p 801, and Wade, The Michigan Law of Damages, p 27-1.

*v Cole,* 15 Mich 265 (1867); *Hyatt v Adams,* 16 Mich 180 (1867). Assuming actual damages were not provable but mental injury certain, exemplary damages became available to compensate the injured party. *Fay v Swan,* 44 Mich 544; 7 NW 215 (1880).

As proof of actual damages is no longer a bar to the award of exemplary damages, so too *actual damages, where properly pled, now include compensation for shame, mortification, mental pain and anxiety, Beath v Rapid R Co,* 119 Mich 512; 78 NW 537 (1899), and for annoyance, discomfiture, and humiliation, *Grenawalt v Nyhuis,* 335 Mich 76; 55 NW2d 736 (1952). In short, *actual damages now include compensation for mental distress and anguish.* [Emphasis supplied.]

In *Veselenak, supra,* p 576, we also said:

Amicus curiae . . . contends that ordinary damages and exemplary damages are not redundant. It maintains that a distinction may be drawn between "mental distress intrinsic to the injury itself (no matter how it occurred) and mental distress emanating from the manner in which the injury occurred." In addition, it claims that ordinary damages for shame and mortification and exemplary damages for humiliation and indignity are compensating "distinct wrongs."

These distinctions are, at least, legally unsound. Semantic niceties aside, juries are not asked to differentiate between mental states, such as shame, mortification, humiliation and indignity. Juries are asked to compensate mental distress and anguish, which flows naturally from the alleged misconduct and may be described in such terms as shame, mortification, humiliation and indignity. In addition, *if the plaintiff is being compensated for all mental distress and anguish, it matters not whether the source of the mental distress and anguish is the injury itself or the way*

*in which the injury occurred.* [Emphasis supplied.][20]

Following *Veselenak,* this Court has further stated:

> When compensatory damages can make the injured party whole, this Court has denied exemplary damages. [*Hayes-Albion Corp v Kuberski,* 421 Mich 170, 187; 364 NW2d 609 (1984).]

Notwithstanding the reasoning in *Veselenak,* we have recognized a distinction where the cause of action is statutorily based and where the statute expressly provides for exemplary damages. In *Peisner v Detroit Free Press,* 421 Mich 125, 135, n 10; 364 NW2d 600 (1984), a libel case, this Court said:

> *In the absence of a legislative prescription for exemplary damages,* we held in *Veselenak* that compensatory-type exemplary damages are merely a component of actual damages attributable to defendant's conduct and hence should not be separately awarded.
>
> *In the libel context, by contrast, the Legislature has provided separately for actual damages for injury to feelings and "exemplary and punitive" damages.* In keeping with the reasoning applied in *Veselenak,* we define exemplary and punitive damages in this context to be a component of compensatory damages awardable only where defendant's conduct amounts to common-law malice. [Emphasis supplied.]

[20] Plaintiffs contend that *Veselenak* is inapplicable because it was limited to the negligence or malpractice context. On the contrary, the Court in *Veselenak* expressly stated it did not reach the issue stated in the grant of leave to appeal, which was "whether exemplary damages should be recoverable in a malpractice or negligence action." *Id.,* p 571. The Court noted that there was no dispute that exemplary damages, if available, would have to be based on intentional, malicious acts, rather than negligence. *Id.,* p 575.

Unlike § 2911(2) of the libel statute, MCL 600.2911(2); MSA 27A.2911(2), the Civil Rights Act includes no express "legislative prescription" for exemplary damages. The remedies section of the Civil Rights Act in relevant part provides:

> A person alleging a violation of this act may bring a civil action for appropriate injunctive relief or damages, or both.
>
> *     *     *
>
> As used in subsection (1), "damages" means damages for injury or loss caused by each violation of this act, including reasonable attorney's fees. [MCL 37.2801; MSA 3.548(801).]

Clearly, there is no express provision in the Civil Rights Act for exemplary damages. Further, our review of its legislative history reveals no basis for inferring a legislative intent to provide such an unusual remedy.

It is noteworthy that the Legislature in fashioning other statutes has not hesitated, where it intended such a result, to include words expressly providing for exemplary damages. For example, exemplary damages are expressly made available in the following statutes: MCL 295.127; MSA 12.1377 (Weather Modification Control Act); MCL 408.488; MSA 17.277(18) (wage violation); MCL 600.2911; MSA 27A.2911 (libel or slander); MCL 750.539h; MSA 28.807(8) (eavesdropping, allowing for punitive damages).[21]

A comparison of the language used in the Civil Rights Act with the language employed in the remedies section for the Weather Modification

---

[21] See 2A Sands, Sutherland Statutory Construction (4th ed), ch 53, pp 549-560, on the use of statutes on other subjects for interpretation. Cf. *Citizens for Pretrial Justice v Goldfarb*, 415 Mich 255; 327 NW2d 910 (1982).

Control Act, MCL 295.127; MSA 12.1377, is revealing. The latter statute provides in pertinent part:

> (1) A person alleging a violation of this act or a rule promulgated pursuant to this act, may bring a civil action for appropriate injunctive relief or damages, *and may bring an action for exemplary damages of not more than $500.00.*
>
> \*   \*   \*
>
> (3) As used in subsection (1), "damages" means damages for injury or loss caused by each violation of this act, including reasonable attorney's fees. [Emphasis supplied.]

The specific provision for exemplary damages in the language of the Weather Modification Control Act stands in sharp contrast with § 801 of the Civil Rights Act, particularly in light of the fact that the definition of "damages" is identical in both statutes. Obviously if the Legislature had determined that exemplary damages should be available in civil rights actions, it could easily have found the words to say so.[22]

Having found no basis in the statute for a separate award of exemplary damages,[23] we would follow this Court's decision in *Veselenak, supra,* and would hold that the jury was erroneously instructed in the instant case to award Mrs. Eide

---

[22] We note that the Handicappers' Civil Rights Act, MCL 37.1101; MSA 3.550(101), has been held to permit recovery of exemplary damages. *Wardlow v Great Lakes Express Co,* 128 Mich App 54, 70; 339 NW2d 670 (1983). The holding in *Wardlow,* however, was based on cases which held that the Civil Rights Act provides for exemplary damages. *Ledsinger v Burmeister,* 114 Mich App 12; 318 NW2d 558 (1982); *Moll v Parkside Livonia Credit Union,* 525 F Supp 786 (ED Mich, 1981); *Freeman v Kelvinator, Inc,* 469 F Supp 999 (ED Mich, 1979). Our holding in the instant case therefore disapproves of the reasoning in the cases relied on in *Wardlow.* Although this Court denied leave to appeal in *Wardlow,* 419 Mich 871 (1984), such a denial is "not to be regarded as precedent." See MCR 7.321(4).

[23] Cf. *Freeman v Kelvinator, Inc,* n 22 *supra,* 1004.

damages on the basis of mental distress as *both* actual and exemplary damages.

We are not unmindful that good reasons can be summoned to justify recovery of exemplary damages by victims of sexual discrimination or harassment. Judge Feikens made a valid point in *Freeman v Kelvinator, Inc,* 469 F Supp 999, 1004 (ED Mich, 1979), when he wrote that "[a]s anyone who has been the victim of discrimination can attest, the wounds run deeper than the pocketbook." Nevertheless, we are mindful also that the Legislature may have good reasons for omitting from the statute any specific reference to exemplary damages. In the final analysis, whether exemplary damages should be allowed is essentially a policy question, and particularly where, as in this case, the underlying cause of action is a legislative product, we deem it appropriate to leave such a policy determination to the Legislature. See *Davidson v Secretary of State,* 351 Mich 4, 8; 87 NW2d 131 (1957); *French v Ingham Co,* 342 Mich 690, 700; 71 NW2d 244 (1955).

IV

The decision of the Court of Appeals should be reversed with respect to the award to Mr. Eide of damages for loss of consortium and with respect to the award to Mrs. Eide of exemplary damages.

RILEY, C.J., and LEVIN, J., concurred with GRIFFIN, J.